IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 4, 2018 Session


**GLENN R. FUNK v. SCRIPPS MEDIA, INC., ET AL.**


**Appeal by Permission from the Court of Appeals, Middle Section
Circuit Court for Davidson County
No. 16C-333 William B. Acree, Senior Judge**

_____

**No. M2017-00256-SC-R11-CV**

_____


We granted review of this interlocutory appeal arising from a defamation action to address whether the Court of Appeals correctly determined that (1) a showing of malice cannot defeat the fair report privilege and (2) an assertion of the fair report privilege exempts the defendants from part of the protections of Tennessee Code Annotated section 24-1-208, Tennessee's news media shield law. With respect to the first issue, we conclude that neither actual nor express malice defeats the privilege; the only limitations on the fair report privilege are that a report of an official action or proceeding must be fair and accurate. With respect to the second issue, we conclude that the fair report privilege is a defense based upon a source of information that renders the source of the statements the plaintiff alleges to be defamatory unprotected by Tennessee's shield law. Accordingly, we affirm the judgment of the Court of Appeals on the separate grounds stated in this opinion and remand this case to the trial court.


**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Affirmed on Separate Grounds; Case Remanded to the Trial Court**


CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

James D. Kay, Jr., John B. Enkema, and Michael A. Johnson, Nashville, Tennessee, for the appellant, Glenn Richard Funk.

Ronald G. Harris, Jon D. Ross, and William J. Harbison II, Nashville, Tennessee, for the appellees, Scripps Media, Inc., and Phil Williams.

Paul R. McAdoo, Nashville, Tennessee, for the amici curiae, The Associated Press, Cable News Network, Inc., Courthouse News Service, Cox Media Group Northeast d/b/a WHBQ-TV, Gannett Co., Inc., GateHouse Media, LLC, Gray Television, Inc., Meredith Corporation, Nexstar Media Group, Inc., Raycom Media, Inc., Reporters Committee for Freedom of the Press, Sinclair Broadcast Group, Inc., TEGNA, Inc., and Tribune Media Company.

## OPINION

### I. Factual and Procedural Background

Not unlike a Fabergé egg, this appeal presents a case within a case within this case. In 2014, the Office of the District Attorney General for the 20th Judicial District brought criminal charges against Nashville developer David Chase. On June 5, 2015, while the criminal charges were pending, Mr. Chase filed a complaint in federal court in which he alleged that members of Nashville law enforcement had violated his civil rights. District Attorney General Glenn Funk, the plaintiff in this appeal, ultimately decided to dismiss the criminal charges against Mr. Chase but conditioned the dismissal of the charges on Mr. Chase *first* dismissing his federal lawsuit. Mr. Chase complied with this condition. The criminal charges against him were then dismissed on July 1, 2015. However, on August 12, 2015, Mr. Chase filed a complaint in state court in which he alleged, among other claims, that members of Nashville law enforcement conspired to subject him to malicious prosecution.

In his state court lawsuit, Mr. Chase did not bring any claims against Glenn Funk. However, on October 22, 2015, the defendants in Mr. Chase's state court lawsuit did file a sealed motion to compel Glenn Funk to testify about the deal he made with Mr. Chase before dismissing the criminal charges. The motion also discussed a $2,000,000 payment that public relations consultant Bill Fletcher requested of Mr. Chase's father on behalf of an undisclosed source.

On February 3, 2016, NewsChannel 5, a subsidiary of Scripps Media, Inc., broadcast a report about Mr. Chase's state court lawsuit that referred to the plaintiff's deal with Mr. Chase and the request from an undisclosed source for a $2,000,000 payment. On February 4, 2016, the plaintiff filed a complaint against Scripps Media, Inc. and NewsChannel 5's chief investigative reporter, Phil Williams, (collectively "defendants"), alleging that, in the February 3 news report, the defendants claimed the plaintiff solicited a $2,000,000 bribe and blackmailed Mr. Chase into dismissing his

federal court lawsuit. The plaintiff accused the defendants of publishing libelous statements about him, structuring statements to create a defamatory implication, portraying him in a false light, and conspiring to commit these acts. That same evening, NewsChannel 5 broadcast a second news report about Mr. Chase's state court lawsuit. This second report expanded on the information discussed in the first news report and included portions of an interview with Mr. Chase. Three weeks later, on February 26, 2016, the plaintiff amended his complaint to include allegations of libel, defamation by implication, and portrayal in a false light about both the first and second news reports.

On March 14, 2016, the defendants filed a motion for summary judgment.[1] The defendants claimed that the first news report fell entirely under the fair report privilege because the report was about pleadings and depositions filed in a judicial proceeding. The defendants argued that the allegedly defamatory sections of the second news report were either true or protected by United States Supreme Court precedent concerning the use of the word "blackmail." They further proposed that the plaintiff "would also not be able to prove any of the other elements of his libel and false light-invasion of privacy claims as to [the news reports], including a false and defamatory statement concerning Plaintiff, actual malice or damages to reputation, but those elements are not the basis of this Motion."

In addition to the motion for summary judgment, the defendants also filed a motion for a protective order on March 24, 2016, which they amended on April 8, 2016. In their motion, they asked the trial court to stay discovery until after it had decided the motion for summary judgment. They argued that the plaintiff did not need to receive the discovery he requested in order to respond to their motion for summary judgment.

The plaintiff did not respond to the defendants' motion for summary judgment, but he did object to the motion for a protective order, arguing that the discovery was necessary because it would allow him to show that the defendants maliciously published the two news reports, which would defeat the fair report privilege. After hearing arguments, the trial court denied the defendants' motion for a protective order. Upon receiving the plaintiff's next set of interrogatories and requests for production, the defendants responded to a number of the discovery requests, but Scripps Media, Inc. objected to Interrogatories Nos. 4–5, 7–8, 10–14, 17–20, and 24 and Requests for Production Nos. 6, 8–16, 20, 22–25, and 33, and Mr. Williams objected to Interrogatories Nos. 4–5, 7–8, 10–14, 17–20, and 27 and Requests for Production Nos. 4, 6, 7–14, 16,

---

[1]The motion was styled as a motion to dismiss for failure to state a claim. However, there was an affidavit attached to the motion. Therefore, the parties agreed that it should be treated as a motion for summary judgment. See Tenn. R. Civ. P. 12.02; Runions v. Jackson-Madison Cnty. Gen. Hosp. Dist., 549 S.W.3d 77, 81 n.5 (Tenn. 2018).

- 3 -

17, 18, 19, and 31. Both objected on the grounds that the information is protected by Tennessee Code Annotated section 24-1-208(a), Tennessee's news media shield law.

On July 14, 2016, the plaintiff filed a motion to compel the defendants to respond to all of the discovery requests to which the defendants objected on the basis of the shield law. The plaintiff argued that the defendants are not protected by the shield law because, by relying upon the fair report privilege, they are asserting a defense based upon the source of their information, thereby triggering a statutory exception to the shield law's protections. The defendants responded that they are not asserting a defense based upon a source of information. The trial court postponed ruling on this motion to compel until the attorney who represented the defendants in Mr. Chase's state court case was deposed due to the possibility that the information uncovered during this deposition would render the motion moot.

On January 3, 2017, the plaintiff filed a supplemental motion to compel in which he argued that the attorney's testimony had not rendered his motion moot and reasserted that he needed the discovery to show the defendants' malice because malice would defeat the fair report privilege and because, regardless of the privilege, his status as a public official required him to show evidence of malice. The plaintiff also argued that the discovery he sought was relevant to determining whether the documents were "public at the time of broadcast." Because the two news reports described depositions and pleadings that the parties in Mr. Chase's state court lawsuit had agreed were supposed to be filed under seal, the plaintiff claimed that it was unclear whether the fair report privilege even applies to this case.

There are some inconsistencies in the plaintiff's motion to compel regarding the type of information he believed would be sufficient to show malice and defeat the fair report privilege. The plaintiff stated that the requested discovery would aid him in showing that the defendants knew the two news reports were based upon false information. But to support this argument, he cited multiple cases indicating that a defamatory publication made with a desire to cause harm cannot be protected by the fair report privilege. As a result, it is unclear whether the plaintiff sought to discover that the defendants knew the news stories contained false allegations or that the defendants harbored a desire to harm him. The defendants responded that the desired discovery was not relevant because malice does not defeat the fair report privilege.

On January 13, 2017, the trial court heard argument on the plaintiff's motion to compel discovery and held that, because a showing of malice can defeat the fair report privilege, the plaintiff should be allowed to discover information relating to malice. It also held that, because the fair report privilege was a defense based upon a source of information, the exception to the shield law applied. However, rather than holding that the shield law no longer protected the defendants, the trial court found that the exception

- 4 -

only provided the plaintiff with the ability to compel responses to Interrogatories Nos. 7 and 8, which asked that the defendants describe all investigation they conducted regarding the two news reports, and to the corresponding Requests for Production.[2] The court ordered the defendants to answer these interrogatories and disclose all of the sources and documents that the defendants considered when investigating the two news reports. On February 13, 2017, the trial court incorporated its findings of fact and conclusions of law in a written order granting the plaintiff's motion to compel.

The defendants then applied for permission to bring an interlocutory appeal regarding the trial court's interpretation of the fair report privilege and also filed an appeal as of right from the trial court's interpretation of the shield law pursuant to Tennessee Code Annotated section 24-1-208(c)(3). The plaintiff argued against the direct appeal and emphasized that the statutory provision for an appeal as of right did not apply in the defendants' circumstances. On March 13, 2017, the trial court found that the defendants were entitled to an appeal as of right under the shield law and that, regardless, the defendants were entitled to an interlocutory appeal on both issues. Thus, the trial court granted the defendants' interlocutory appeal "upon the issue of whether malice is an element of the fair report privilege and upon the issue of whether the shield law requires disclosure of the Defendants['] source."[3]

The Court of Appeals also granted the defendants' interlocutory appeal, consolidated the appeal with the defendants' direct appeal, and ultimately reversed the trial court's order granting the plaintiff's motion to compel. The Court of Appeals held (1) that the fair report privilege cannot be defeated by a showing of malice and (2) that, while an assertion of the fair report privilege triggers the statutory exception to the shield law, the defendants are only required to disclose the sources they identify as the basis for the reports. We granted the plaintiff's application for permission to appeal in this Court.

---

[2]For Scripps Media, Inc., these were Requests for Production Nos. 13–14, and for Mr. Williams these were Requests for Production Nos. 11–12.

[3]The trial court noted in its order granting the defendant's application for interlocutory appeal that there are numerous errors in the transcript of the hearing on the motion to compel discovery. Therefore, we primarily rely on the summarization of the trial court's findings and conclusions contained in its order granting interlocutory appeal.

## II. Scope and Standard of Review

"Unlike an appeal as of right under Tennessee Rule of Appellate Procedure 3, in which both the appellant and the appellee have broad latitude with regard to the issues that may be raised, '[w]hen dealing with an interlocutory appeal, the Court can and will deal only with those matters clearly embraced within the question certified to it.'" Young v. City of LaFollette, 479 S.W.3d 785, 789 (Tenn. 2015) (quoting Tennessee Dep't of Mental Health & Mental Retardation v. Hughes, 531 S.W.2d 299, 300 (Tenn. 1975)).[4] This appeal arises from a trial court's ruling on a pretrial discovery dispute. Trial court decisions on pretrial discovery disputes are reviewed using an abuse of discretion standard. Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." Id. Whether a court applied an incorrect legal standard is a question of law that is reviewed de novo. Id. at 525. The issues in this appeal concern legal standards, specifically, what role, if any, malice plays in the fair report privilege, whether the fair report privilege is a defense based upon a source of information that triggers the exception to Tennessee's news media shield law, and if it is, the extent of the discovery to which the plaintiff is entitled. These issues are questions of law that are reviewed under a de novo standard with no presumption of correctness. See Wallace v. Metro. Gov't of Nashville, 546 S.W.3d 47, 52 (Tenn. 2018).

## III. Analysis

### A. Malice and the Fair Report Privilege

This appeal demonstrates the tension that exists between two competing social commodities: reputation and information. Protecting the first commodity are defamation lawsuits, which enable aggrieved individuals to seek redress from false statements of fact that impugn their reputations. In the 1966 case Rosenblatt v. Baer, 383 U.S. 75, 92 (1966) (Stewart, J., concurring), former United States Supreme Court Justice Potter Stewart emphasized the importance of protecting individuals from reputational harm, noting that: "The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of

---

[4]We recognize that the defendants raised the shield law issue in a direct appeal as well as in his interlocutory appeal. In the trial court and the Court of Appeals, plaintiff argued that the shield law did not provide for a direct appeal in these circumstances. However, neither party has raised this issue in this appeal. Therefore, we will not address it and will treat both issues as interlocutory.

ordered liberty." The danger posed by defamation lawsuits is that, if unrestrained, these lawsuits may obstruct access to the second commodity, information. For this reason, courts have developed a variety of privileges that provide defenses to defamation claims even when the accused actually defamed the accuser. See generally Restatement (Second) of Torts §§ 583–612 (1977). One of these privileges is at issue in this appeal, the fair report privilege.

*1. The History of the Fair Report Privilege*

Common law has long provided that a person who repeats the defamatory statements made by another is also liable for defamation. See VI Matthew Bacon with Henry G. William and Bird Wilson, A New Abridgment of the Law 238–39 (Philadelphia, Philip H. Nicklin 1813) ("[T]hese words, *Thou art a sheep[]stealing rogue, and farmer* Parker *told me so*, were holden to be actionable; although it was not averred, that farmer *Parker* did not tell the defendant so . . . ."); see also Dameron v. Washington Magazine, Inc., 779 F.2d 736, 739 (D.C. Cir. 1985) (discussing "the common law rule that one who repeats or republishes a defamation uttered by another 'adopts' it as his own").

The fair report privilege originated in Curry v. Walter, 126 Eng. Rep. 1046 (C.P. 1769), when an English judge observed that a newspaper should not be held liable for republishing allegedly defamatory statements made during a judicial proceeding because such a proceeding "is open to all the world." Kathryn Dix Sowle, Defamation and the First Amendment: The Case for a Constitutional Privilege of Fair Report, 54 N.Y.U. L. Rev. 469, 478 & n.40 (1979) (quoting Curry, 126 Eng. Rep. at 1046). American courts later adopted the fair report privilege and expanded it to protect the publication of reports about a variety of official actions or proceedings. See David Elder, Defamation: A Lawyer's Guide § 3:1 (July 2018 update). American courts also identified another justification for the fair report privilege beyond the original justification—that newspapers should be allowed to report on publicly accessible information. Id. The second justification is that the privilege facilitates the worthwhile goal of public supervision of official actions or proceedings. Id.; see also Cox Broad. Corp. v. Cohn, 420 U.S. 469, 492 (1975) ("With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice.").

Traditionally, courts held that the privilege applied to fair and accurate reports of official actions or proceedings, even if the report included false and defamatory statements made during the official proceeding, so long as the reports were "not made solely for the purpose of causing harm to the person defamed." Restatement (First) of Torts § 611 (1938) (collecting cases). In the context of defamation law, this desire to harm another has been referred to by a number of terms that courts have used

interchangeably. These terms include malice, express malice, common law malice, and malice in fact. See, e.g., Novecon Ltd. v. Bulgarian-Am. Enter. Fund, 190 F.3d 556, 567 (D.C. Cir. 1999). Such a wide variety of terms can lead to confusion, particularly when combined with the separate concept of 'actual malice,' which we will discuss in the next section. See Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 667 n.7 (1989) ("The phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will."); Crump v. P & C Food Markets, Inc., 576 A.2d 441, 447 n.1 (Vt. 1990) ("We note that much confusion has arisen over the terminology applied to the malice requirement in its various contexts: courts have used the term 'actual malice' in reference to both types of malice."); Ullrich v. New York Press Co., 23 Misc. 168, 171– 72, 50 N.Y.S. 788, 791 (Sup. Ct. 1898) ("The jumble in some modern text-books on slander and libel concerning malice, actual malice, malice in law, malice in fact, implied malice and express malice (all derived from judicial utterances, it is true), is a striking testimony of the limitations of the human mind."). For purposes of clarity, we will refer to the desire to harm another in the context of a defamation action as express malice.

### 2. *Express Malice and Actual Malice Distinguished and Reconsidered*

Express malice differs from the concept of actual malice, which gained constitutional standing in two 1964 United States Supreme Court decisions. In New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964), the United States Supreme Court held that public officials cannot recover damages for defamatory falsehoods relating to their official conduct unless they show that the statements were made with "actual malice." Sullivan defined actual malice as acting "with knowledge that [a statement] was false or with reckless disregard of whether it was false or not." Id. at 280. Sullivan provided several justifications for this heightened showing requirement. First, the actual malice standard takes into account that "public [officials] are, as it were, public property" and, as such, should be less protected from criticism and commentary than a private person. Id. at 268 (quoting Beauharnais v. Illinois, 343 U.S. 250, 263 n.18 (1952)); see also Press, Inc. v. Verran, 569 S.W.2d 435, 438–41 (Tenn. 1978) (providing a detailed history of United States Supreme Court opinions on this topic). Second, the actual malice standard encourages the press not to self-censor when discussing matters of particular importance to the public. Sullivan, 376 U.S. at 277–81. Third, the actual malice standard provides a "fair equivalent" to the privilege protecting public officials from liability for the statements they make during the performance of their duties. Id. at 282. In Garrison v. State of Louisiana, 379 U.S. 64, 73 (1964), the United States Supreme Court explained why it chose to condition defamation liability on a showing of actual malice rather than express malice:

> Debate on public issues will not be uninhibited if the speaker must run the
> risk that it will be proved in court that he spoke out of hatred; even if he did

speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth.

These United States Supreme Court decisions prompted a number of states to consider whether a showing of actual malice, as defined in New York Times, defeats the fair report privilege. In the state court decisions we have reviewed, the vast majority of states have concluded that it does not defeat the privilege. See Butler v. Hearst-Argyle Television, Inc., 49 S.W.3d 116, 120 (2001) (finding it significant that "the privilege exists 'even though the publisher himself does not believe the defamatory words he reports to be true and even when he knows them to be false'" (quoting Restatement (Second) of Torts § 611 cmt. a)); Ltc. Lawton v. Georgia Television Co., No. CIV. A. E-12269, 1994 WL 538892, at *8 (Ga. Super. May 5, 1994), aff'd sub nom. Lawton v. Georgia Television Co., 456 S.E.2d 274 (Ga. Ct. App. 1995); Solaia Tech., LLC v. Specialty Pub. Co., 852 N.E.2d 825, 843–44 (Ill. 2006); Howell v. Enter. Publ'g Co., LLC, 920 N.E.2d 1, 13 n.8 (Mass. 2010); Adelson v. Harris, 402 P.3d 665, 667–68 (Nev. 2017); Thomas v. Tel. Publ'g Co., 929 A.2d 993, 1007–08 (N.H. 2007), as modified on denial of reconsideration (Aug. 29, 2007); Salzano v. N. Jersey Media Grp. Inc., 993 A.2d 778, 796–98 (N.J. 2010); Freedom Comm'ns, Inc. v. Sotelo, No. 11-05-00336-CV, 2006 WL 1644602, at *3–4 (Tex. App. June 15, 2006); Russell v. Thomson Newspapers, Inc., 842 P.2d 896, 904 (Utah 1992); see also DeMary v. Latrobe Printing & Pub. Co., 762 A.2d 758, 764 (Pa. Super. 2000) ("Thus, in a defamation action by a plaintiff public figure against a defendant newspaper, the fair report privilege is not implicated until the plaintiff has met his or her constitutionally mandated burden in showing that the newspaper acted with actual malice."). But see Am. Chem. Soc. v. Leadscope, Inc., 978 N.E.2d 832, 859 (Ohio 2012) (finding that actual malice defeats the privilege). Furthermore, the Restatement (Second) of Torts states in several sections that actual malice does not defeat the fair report privilege because actual malice protects different interests than the interests protected by the fair report privilege. See Restatement (Second) of Torts §§ 599 cmt. c, 600 cmt. c, 611 cmts. a–b. Instead, under the Restatement (Second) of Torts section 611, the fair report privilege may be defeated by a showing that the report was unfair or inaccurate.

Courts have also reconsidered the role that the motive to harm another—express malice—plays in the fair report privilege. After New York Times and Garrison, several other United States Supreme Court decisions emphasized the importance of public access to information about governmental proceedings. See, e.g., Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 838–40 (1978) (finding that the First Amendment protection of the "free discussion of governmental affairs" prevented Virginia from criminalizing the disclosure of confidential proceedings held by a judicial review commission (quoting Mills v. State of Ala., 384 U.S. 214, 218 (1966))); Cox, 420 U.S. at 496 ("At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records."). As

a result of this line of United States Supreme Court opinions, a number of states have eschewed the traditional approach to the fair report privilege for a modern approach that looks only at whether a report of an official action or proceeding is fair and accurate, eliminating express malice from consideration. See Read v. News-Journal Co., 474 A.2d 119, 120–21 (Del. 1984); Solaia, 852 N.E.2d at 842–44; Moreno v. Crookston Times Printing Co., 610 N.W.2d 321, 332–33 (Minn. 2000); Salzano, 993 A.2d at 795–98 & 796 n.9. But see Wilson v. Birmingham Post Co., 482 So. 2d 1209, 1213 (Ala. 1986); Doneghy v. WKYT 27 News First, No. 2014-CA-001850-MR, 2016 WL 7030420, at *2–3 (Ky. Ct. App. Dec. 2, 2016); Thomas, 929 A.2d at 1008; Russell, 842 P.2d at 905.

Courts that have adopted the modern approach do so for a variety of reasons. Some conclude that the express malice limitation is an unproductive limitation on the privilege. See Read, 474 A.2d at 120–21 (finding "the motive of a publisher irrelevant" to the "rationale for the breadth of the privilege"). Others are content to adopt it because it is the approach of the Restatement (Second) of Torts. See, e.g., Butler, 49 S.W.3d at 120; Solaia, 852 N.E.2d at 843–44; see also Restatement (Second) of Torts § 611 reporter's note ("This Section has been changed from the first Restatement . . . by the deletion of Clause (b), which made it a condition of the privilege that the publication not be 'made solely for the purpose of causing harm.'"). Of the courts that adhere to the traditional approach, several do so because they are bound by statute. See Wilson, 482 So. 2d at 1213; Doneghy, 2016 WL 7030420, at *2; Russell, 842 P.2d at 904–05. Others do so because it is how they have always analyzed the privilege. See DeMary, 762 A.2d at 763–65.

### 3. Tennessee's Limitations on the Fair Report Privilege

The plaintiff argues that we should follow the traditional approach to the fair report privilege and conclude that express malice defeats the privilege. During oral argument, he also suggested that, should this court decide to deviate from the traditional approach, actual malice is a workable alternate limitation to express malice. The defendants argue we should conclude that neither actual nor express malice defeats the privilege.

We will consider first whether actual malice can defeat the fair report privilege. Tennessee adopted the fair report privilege in Saunders v. Baxter, 53 Tenn. 369 (1871). Saunders restricted the scope of the privilege to "bona fide report[s] of the proceedings in a court of justice, in the absence of express malice." Id. at 381. At various points throughout the opinion, the Saunders Court defined malice as the lack of "good motives or . . . justifiable ends," "personal ill-will," and "hatred." Id. at 384, 386–87. Although Saunders and other early Tennessee opinions on the fair report privilege also used the term "actual malice," these opinions treated the term as synonymous with express malice. Id. at 386; Am. Pub. Co. v. Gamble, 90 S.W. 1005, 1009–10 (Tenn. 1906); Langford v.

<u>Vanderbilt Univ.</u>, 287 S.W.2d 32, 37 (Tenn. 1956). The manner in which Tennessee courts have used the term "actual malice" caused some confusion for the parties. Indeed, the plaintiff's counsel admitted at oral argument, "In the trial court, I don't think either party recognized, including the judge, the complexity of the term actual malice. And there really were no discussions of, well, what exactly does that mean."

After <u>New York Times</u> provided the term "actual malice" with a new and specific meaning, some courts applying Tennessee law have found that this type of actual malice can defeat the fair report privilege, although their opinions lack any clear explanation as to why. The Court of Appeals has provided contradictory guidance about whether actual malice can defeat the fair report privilege. <u>Compare</u> <u>Grant v. Commercial Appeal</u>, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *5–8 (Tenn. Ct. App. Sept. 18, 2015) (noting that for the fair report privilege to apply "the report must not be made with actual malice"), <u>with</u> <u>Honig v. Nashville Banner Pub. Co.</u>, 10 Media L. Rep. 2139, 1984 Tenn. App. Lexis 3034 (July 31, 1984) (noting that the privilege applies even if the report concerns a judicial proceeding that is "an obvious farce and misuse of the judicial process"). The opinion in <u>Grant</u> provided no rationale for its conclusion that a "report must not be made with actual malice" but simply cited a federal district court decision, <u>Milligan v. U.S.</u>, 644 F.Supp.2d 1020, 1033 (M.D. Tenn. 2009), <u>aff'd</u> 670 F.3d 686 (6th Cir. 2012), and a Court of Appeals opinion, <u>Lewis v. NewsChannel 5 Network, L.P.</u>, 238 S.W.3d 270, 284–85 (Tenn. Ct. App. 2007). <u>Grant</u>, 2015 WL 5772524, at *6.

The <u>Grant</u> opinion's reliance on <u>Lewis</u> was inapt. <u>Lewis</u> did not treat actual malice as a limitation on the fair report privilege. 238 S.W.3d at 284–88. Instead, <u>Lewis</u> concluded that the fair report privilege could not apply because the allegedly defamatory statements were not made in the course of "official actions or proceedings." <u>Id.</u> (finding that information obtained from "anonymous informants, a private conversation with [a police officer], and recordings of official radio transmissions and telephone calls that had not been released to the public" did not qualify as "information obtained as a result of an official action or proceeding"). <u>Lewis</u> only considered actual malice as a component of the prima facie defamation claim. <u>Id.</u>

<u>Milligan</u> *does* support the proposition for which <u>Grant</u> cited it—that actual malice defeats the fair report privilege. Indeed, federal courts have uniformly held that under Tennessee law actual malice defeats this privilege. <u>See</u> <u>Milligan v. United States</u>, 670 F.3d 686, 696–98 (6th Cir. 2012); <u>Molthan v. Meredith Corp.</u>, No. 3:17-CV-00380, 2018 WL 691338, at *11 (M.D. Tenn. Feb. 2, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-00380, 2018 WL 2387235 (M.D. Tenn. May 25, 2018); <u>Hill v. Old Navy, LLC</u>, 20 F. Supp. 3d 643, 648 (W.D. Tenn. 2014); <u>Archibald v. Metro. Gov't of Nashville & Davidson Cnty.</u>, No. 3:11-0728, 2012 WL 3000137, at *4 (M.D. Tenn. July 23, 2012), <u>report and recommendation adopted</u>, No. 3-11-0728, 2012 WL 3283480 (M.D. Tenn. Aug. 10, 2012); <u>ADT Servs. AG v. Brady</u>, No. 2:10-02197, 2011 WL 13092411, at *3

- 11 -

(W.D. Tenn. Jan. 4, 2011); Stem v. Gannett Satellite Info. Network, Inc., 866 F. Supp. 355, 360 (W.D. Tenn. 1994). However, these federal court decisions result either from misreading Lewis in the same manner that Grant misread it, see Milligan, 670 F.3d at 696, or from failing to understand that early Tennessee opinions employed the term "actual malice" as a reference to express malice, see Stem, 866 F. Supp. at 360 (citing Langford, 287 S.W.2d at 36–37; Am. Pub. Co., 90 S.W. at 1010). Thus, we are unpersuaded by the Court of Appeals and federal court decisions that have treated New York Times actual malice as a limitation on the fair report privilege.

As mentioned previously, the New York Times actual malice standard protects a number of interests that differ from those protected by the fair report privilege. See Time, Inc. v. Firestone, 424 U.S. 448, 455 (1976) ("[W]e likewise reject petitioner's claim for automatic extension of the New York Times privilege to all reports of judicial proceedings."); see also Restatement (Second) of Torts §§ 599 cmt. c, 600 cmt. c, 611 cmts. a–b. The actual malice standard provides a carefully crafted restriction on defamation claims brought by public officials that takes into account a public official's interest in preventing the spread of defamatory statements and the argument that such officials merit reduced protections because they have assumed positions that expose them to public scrutiny. But the fair report privilege has long protected reports of judicial proceedings even if the report includes defamatory statements made in judicial proceedings and even when those reporting on the judicial proceedings knew the statements were false. See, e.g., Restatement (First) of Torts § 611 cmt. a ("This privilege differs from the usual conditional privilege in that it affords protection even though the defamatory statement reported is known to be false."); Restatement (Second) of Torts § 611 cmt. a (same). This is because, when a statement is made in a judicial proceeding, the statement is worthy of public notice, not only as a result of the contents of the statement, but also because of the context in which the statement was made. If we were to now hold that a reporter's knowledge of a statement's falsity could defeat the fair report privilege, it would undermine the purposes of the privilege. It would lessen the public's opportunities to be "apprised of what takes place in the proceedings without having been present," Smith v. Reed, 944 S.W.2d 623, 625 (Tenn. Ct. App. 1996); Salzano, 993 A.2d 797–98, and to "assess the value of our government in action," Solaia, 852 N.E.2d at 848. For these reasons, we hold that a showing of actual malice cannot defeat the fair report privilege.

We consider next the plaintiff's argument that we should adhere to the traditional approach to the fair report privilege and continue to apply the express malice limitation. As acknowledged, all of our prior decisions follow this approach. However, in light of the modern approach, we choose to reconsider the usefulness of the express malice limitation. The Court of Appeals has addressed this matter but, like its treatment of actual malice, has reached inconsistent conclusions. Compare Burke v. Sparta Newspapers, Inc., No. M2016-01065-COA-R3CV, 2018 WL 3530839, at *3 (Tenn. Ct.

App. July 23, 2018) ("For the privilege to apply, the report must be 'a fair and accurate summation of the proceeding.'" (quoting <u>Smith</u>, 944 S.W.2d at 625)), <u>and</u> <u>Eisenstein v. WTVF-TV, News Channel 5 Network, LLC</u>, 389 S.W.3d 313, 323 n.8 (Tenn. Ct. App. 2012) ("It appears that at one time the fair report privilege required an absence of malice."), <u>with</u> <u>Honig</u>, 1984 Tenn. App. Lexis 3034 ("Where the publication is determined to be a fair and accurate statement of the contents of the public record, it is presumed to have been made without malice; and the burden of showing malice is upon the plaintiff.").

The plaintiff argues that without the express malice limitation reporters with vendettas may solicit or goad others into making defamatory statements in official proceedings and then repeat the defamatory statements to the public without punishment. This argument resembles the reason that New Hampshire has provided for not adopting the modern approach: "Allowing plaintiffs to try to establish common law malice, where appropriate, will guard against abuse of the privilege and ensure that the privilege continues to be used as a shield, not a sword." <u>Thomas</u>, 929 A.2d at 1008. We agree that the scenarios the plaintiff describes would be cause for concern. But, in such unusual circumstances, it is unlikely that the fair report privilege would apply. As explained in the Restatement (Second) of Torts section 611 comment c,

> A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not. Nor may he confer the privilege upon a third person, even a member of the communications media, by making the original statement under a collusive arrangement with that person for the purpose of conferring the privilege upon him.

This provision prevents journalists from using the privilege as a sword rather than a shield.

The plaintiff further argues that the express malice limitation is necessary to deter reporters from injuring others with fair and accurate reports of official actions or proceedings "in this age of 'fake news' and increasing politically motivated news stories." Yet, in application, an express malice limitation on the privilege would do little to prevent the publication of defamatory statements made in an official proceeding. Consider the following hypothetical. Two reporters fairly and accurately report on a judicial proceeding and include defamatory statements made during the proceeding in their reports. One of the reporters happens to dislike the person about whom the defamatory statements were made and privately hopes that the republication of the defamatory statements will cause that person harm. Under the traditional approach to the fair report privilege, one of the reporters would be able to rely on the fair report privilege

- 13 -

to defend against a defamation action but the other reporter would not. This result would neither advance the purposes of the fair report privilege nor protect the individuals about whom defamatory statements were made.[5]

Having weighed the arguments for and against the traditional and modern approach, we are persuaded that the modern approach better serves the purposes of the fair report privilege. Therefore, in keeping with our earlier decisions concerning defamation law, we adopt the approach of the Restatement (Second) of Torts section 611. See Jones v. State, 426 S.W.3d 50, 56 (Tenn. 2013) (adopting Restatement (Second) of Torts section 591 as governing the executive and administrative officers' privilege); Simpson Strong-Tie Co. v. Stewart, Estes & Donnell, 232 S.W.3d 18, 22–24 (Tenn. 2007) (adopting Restatement (Second) of Torts section 586 as governing the attorneys' privilege). We hold that neither express malice nor actual malice can defeat the fair report privilege. The privilege can only be defeated by showing that a report about an official action or proceeding was unfair or inaccurate.

At this stage in the litigation, it is unclear whether the two news reports qualify as reports of an official action or proceeding for the purposes of the fair report privilege. According to the plaintiff, the defendants' news reports about the depositions and other pieces of discovery in Mr. Chase's state court lawsuit do not fall under the protections of the fair report privilege because, at the time the reports were broadcast in February of 2016, the parties in Mr. Chase's state court lawsuit had signed a protective order agreeing that this information would be filed under seal. The plaintiff's assertion is muddied by the fact that, when the reports were broadcast, the court had not yet ruled on this protective order. At oral argument, the defendants asserted that the first report and part of the second do fall under the fair report privilege because the information contained in the relevant sections of the news reports had already been disclosed in the motion to compel the examination of Glenn Funk that was filed in Mr. Chase's state court lawsuit on October 22, 2015. However, the motion to compel states that the "Motion and its Exhibits are filed under seal pending the Court's ruling on Non-Parties' assorted motions asserting confidentiality over certain materials and testimony cited herein." Thus, on remand, in addition to determining whether the reports were fair and accurate, the trial court will still have to determine whether the news reports concerned information that was obtained from an official action or proceeding.

---

[5]The amicus curiae brief raised the argument that the express malice limitation is unconstitutional because the speech protected by the fair report privilege is also protected by the First Amendment. This constitutional issue was not raised in the application for interlocutory appeal. Therefore, we will not address it.

## B. The Exception to the Shield Law

When considering the appropriateness of discovery requests, courts are guided by the "time-honored rule that the public has a right to every man's evidence." Austin v. Memphis Pub. Co., 655 S.W.2d 146, 150 (Tenn. 1983). As with so many other legal rules, this rule is not universally applicable. In 1973, the Tennessee General Assembly enacted Tennessee Code Annotated section 24-1-208, Tennessee's news media shield law, to protect "person[s] engaged in gathering information for publication or broadcast" from being compelled to disclose "before the general assembly or any Tennessee court, grand jury, agency, department, or commission any information or the source of any information procured for publication or broadcast."[6] However, in two statutorily specified circumstances, a party may still obtain such information or the source of such information. One of those circumstances occurs when the party has demonstrated "by clear and convincing evidence that":

> (A) There is probable cause to believe that the person from whom the information is sought has information which is clearly relevant to a specific probable violation of law;
>
> (B) The person has demonstrated that the information sought cannot reasonably be obtained by alternative means; and
>
> (C) The person has demonstrated a compelling and overriding public interest of the people of the state of Tennessee in the information.

Tenn. Code Ann. § 24-1-208(c)(2) (2017). The other of those circumstances occurs when a "defendant in a civil action for defamation asserts a defense based upon the source of [the allegedly defamatory] information." Tenn. Code Ann. § 24-1-208(b); see also Tenn. Op. Att'y Gen. No. 16-23 (June 21, 2016) (noting that the showing requirement of section 208(c) does not apply to section 208(b)). The questions presented to us concerning the shield law involve the latter of the two circumstances. Plaintiff asks whether the fair report privilege is a defense based upon the source of the allegedly defamatory information such that its assertion triggers the exception to the shield law

---

[6] In Austin, we described the General Assembly's enactment of the shield law as a reaction to the United States Supreme Court's holding in Branzburg v. Hayes, 408 U.S. 665 (1972), that "requiring a newsman to testify before a grand jury did not abridge the freedom of speech and press guaranteed by the First Amendment nor did the newsman's confidentiality agreement, to conceal the sources, the material and the criminal acts, invoke a constitutional privilege." 655 S.W.2d at 149. Indeed, the statute contains "almost identical language" to the language used by Justice Stewart in his dissenting opinion in Branzburg. Id. at 149–50.

provided in Tennessee Code Annotated section 24-1-208(b) and, if so, what does the exception entitle the plaintiff to discover. These are both issues of first impression.

According to the trial court's order granting permission for an interlocutory appeal, the plaintiff primarily seeks to discover evidence of malice in order to defeat the fair report privilege. As a result of our holding that neither actual nor express malice can defeat the fair report privilege, this discovery is not relevant to the plaintiff's defamation claims regarding any part of the first or second news report that is protected by the fair report privilege. However, the plaintiff asserts that, even if actual malice does not defeat the fair report privilege, he is still entitled to the requested discovery because, as a public official, at some point in this case, he must prove actual malice to prevail on his claims. The defendants argue that the defamation and false light claims for which actual malice is relevant are not at issue at this stage of the litigation. We are constrained to disagree with the defendants. Because the trial court has not yet ruled on the defendants' motion for summary judgment, this issue remains unresolved. In the absence of any ruling by the trial court, we find that, due to the plaintiff's status as a public official, actual malice remains relevant to this case, and the plaintiff's request for discovery of information regarding actual malice is an issue ripe for resolution in this appeal. Therefore, we will consider the substance of the questions presented concerning the exception to the shield law.

When answering these questions, we are bound by familiar principles of statutory interpretation. Our "overarching purpose in construing statutes is to ascertain and effectuate legislative intent, without expanding a statute beyond its intended scope." Ray v. Madison Cnty., Tennessee, 536 S.W.3d 824, 831 (Tenn. 2017). To achieve this purpose, we begin with the plain language of the statute. Lee Med., Inc., 312 S.W.3d at 526. "We presume that every word in a statute has meaning and purpose and that each word's meaning should be given full effect as long as doing so does not frustrate the General Assembly's obvious intention." Harris v. Haynes, 445 S.W.3d 143, 146 (Tenn. 2014). "The words used in a statute are to be given their natural and ordinary meaning . . . ." Wallace, 546 S.W.3d at 52. If the language of the statute is clear and unambiguous, we "apply its plain meaning in its normal and accepted use." State v. Frazier, No. M2016-02134-SC-R11-CD, 2018 WL 4611624, at *4 (Tenn. Sept. 26, 2018) (quoting State v. Hannah, 259 S.W.3d 716, 721 (Tenn. 2008)). If the language of the statute is ambiguous, we look to "the overall statutory scheme, the legislative history, and other sources" to aid our interpretation. Sneed v. City of Red Bank, Tennessee, 459 S.W.3d 17, 23 (Tenn. 2014).

The defendants argue that the fair report privilege does not trigger the shield law exception because the shield law exception applies only when a defendant asserts a defense based upon a source that is confidential. The amicus curiae argue that the exception only applies when the source is a person. However, if the General Assembly

had desired to limit the meaning of "source of information" to people or confidential sources, it certainly could have done so by including further restrictions in the statute. See Tenn. Code Ann. § 24-1-208(a)–(b). Indeed, a number of states have opted to include definitions for "source" as part of their shield laws. See Colo. Rev. Stat. Ann. § 13-90-119 (West, Westlaw through end of the 2nd Reg. Sess. of the 71st Gen. Ass.); Del. Code Ann. tit. 10, § 4320 (West, Westlaw through 81 Laws 2018); 735 Ill. Comp. Stat. Ann. 5/8-902 (West, Westlaw through 2018 Reg. Sess.); N.J. R. Evid. N.J.R.E. 508; N.M. R. Evid. Rule 11-514; Utah R. Evid. 509; see also Minn. Stat. Ann. § 595.023 (West, through the end of the 2018 Reg. Sess.) (protecting from disclosure "the person or means from or through which information was obtained"). The General Assembly has not chosen that option. See Austin, 655 S.W.2d at 149.

Accordingly, in the absence of any statutory definition, we look to the normal and accepted use of the word "source." In prior opinions, we have found Black's Law Dictionary to be a particularly useful aid to ascertaining the plain meaning of statutory text. See In re Estate of Tanner, 295 S.W.3d 610, 626 (Tenn. 2009) ("We have specifically identified Black's Law Dictionary as a reliable source."); State v. Edmondson, 231 S.W.3d 925, 928 (Tenn. 2007) ("When the Legislature does not provide a specific definition for a statutory term, this Court may look to other sources, including Black's Law Dictionary, for guidance."); see also Garrison v. Bickford, 377 S.W.3d 659, 669 (Tenn. 2012) (defining "bodily injury"); Allmand v. Pavletic, 292 S.W.3d 618, 625 (Tenn. 2009) (defining "public utility"). Black's Law Dictionary (10th ed. 2014) defines "source" as "[t]he originator or primary agent of an act, circumstance, or result." It further provides that "originator" means "*someone* who conceives of something and starts it," and "agent" means "*something* that produces an effect." Id. (emphasis added). These definitions indicate that "source" encompasses documents and events as well as people. Applying this definition to the shield law, we find that the statute uses "source" in a broad manner that includes official actions or proceedings. Cf. Bank of Nova Scotia v. United States, 487 U.S. 250, 264 (1988) (Marshall, J., dissenting) (referring to governmental disclosures as a "source of information"); Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33 (1984) (referring to certain judicial proceedings as a "source of information"). By asserting the fair report privilege, the defendants are claiming that the allegedly defamatory information they published is privileged because the source of that information is an official action or proceeding. Therefore, under the circumstances of this case, we hold that the fair report privilege is a defense based upon the source of the allegedly defamatory information, and as such, the assertion of this defense triggers the exception to the shield law in Tennessee Code Annotated section 24-1-208(b).[7]

---

[7] This holding aligns with how other state courts have interpreted "source" in the context of news media shield laws. Many states have news media shield laws that do not define "source." See Ala. Code § 12-21-142 (West, Westlaw through Act 2018-579); Alaska Stat. Ann. § 09.25.300 (West, Westlaw through 2018 2nd Reg. Sess. of 30th Legis.); Ariz. Rev. Stat. Ann. § 12-2237 (West, Westlaw through 1st

The final issue for us to resolve is the scope of the exception. The plaintiff claims that the exception allows him to discover the source of *any* information, regardless of whether the information was procured for publication or broadcast, and that this

Special and 2nd Reg. Sess. of 53rd Legislature (2018)); Ark. Code Ann. § 16-85-510 (West, Westlaw through 2018 Fiscal Sess. and 2nd Extra. Sess. of 91st Ark. Gen. Ass.); D.C. Code Ann. § 16-4702 (West, Westlaw through Dec. 13, 2018); Fla. Stat. Ann. § 90.5015 (West, Westlaw through 2018 2nd Reg. Sess. of 25th Legis.); Ind. Code Ann. § 34-46-4-2 (West, Westlaw through 2018 2nd Reg. Sess. and 1st Special Sess. of 120th Gen. Ass.); Kan. Stat. Ann. § 60-481 (West, Westlaw through laws effective on or before July 1, 2018); Ky. Rev. Stat. Ann. § 421.100 (West, Westlaw through end of 2018 reg. sess.); La. Stat. Ann. § 45:1452 (West, Westlaw through 2018 3rd Extra. Sess.); Md. Code Ann., Cts. & Jud. Proc. § 9-112 (West, Westlaw through 2018 Reg. Sess. of Gen. Ass.); Mont. Code Ann. § 26-1-902 (West, through chapters effective Feb. 12, 2019 sess.); Neb. Rev. Stat. Ann. § 20-144 (West, through 2nd Reg. Sess. of 105th Legislature (2018)); Nev. Rev. Stat. Ann. § 49.275 (West, Westlaw through 79th Reg. Sess. (2017)); N.Y. Civ. Rights Law § 79-h (McKinney, Westlaw through L.2018); N.D. Cent. Code Ann. § 31-01-06.2 (West, Westlaw through 2017 Reg. Sess. of 65th Legis. Ass.); Ohio Rev. Code Ann. § 2739.12 (West, Westlaw through File 172 of 132nd Gen. Ass. (2017–2018)); Okla. Stat. Ann. tit. 12, § 2506 (West, Westlaw through 2nd Reg. Sess. of 56th Legislature (2018); Or. Rev. Stat. Ann. § 44.520 (West, Westlaw through 2018 Reg. Sess. and 2018 Spec. Sess. of 79th Legis. Ass.)); 42 Pa. Cons. Stat. Ann. § 5942 (West, Westlaw through 2018 Reg. Sess.); 9 R.I. Gen. Laws Ann. § 9-19.1-2 (West, Westlaw through Ch. 353 of Jan 2018 Sess.). Only a handful of courts in these states have discussed how to interpret the word "source." These courts have employed several interpretive approaches that include consulting dictionaries, see Svoboda v. Clear Channel Commc'ns, Inc., 805 N.E.2d 559, 567 (Ohio Ct. App.) (citing Merriam–Webster's Collegiate Dictionary 1123 (10th ed. 1996)), cause dismissed, 817 N.E.2d 104 (Ohio 2004); In re Taylor, 193 A.2d 181, 184–85 (Pa. 1963) (citing Webster's New International Dictionary 245 (2nd ed.), 2177 (3d ed.); 10 Oxford English Dictionary 275–76), overruled in part on other grounds by Hatchard v. Westinghouse Broad. Co., 532 A.2d 346 (Pa. 1987), consulting law review notes, see Lightman v. State, 294 A.2d 149, 153, 157 (Md. Ct. Spec. App.) (citing Recent Case, Evidence — Privileged Communications — Journalist Need Not Reveal Information Disclosed by Confidential Informant. — In the Matter of Taylor (Pa. 1963)., 77 Harv. L. Rev. 556 (1964); Case Comment, Newpapermen Not Required to Divulge Confidential Information to Investigating Grand Jury, 112 U. Pa. L. Rev. 438, 439 (1964)), consulting journalism-specific glossaries, see In re Indiana Newspapers Inc., 963 N.E.2d 534, 547 (Ind. Ct. App. 2012) (citing The Wall Street Journal, Terms in Journalism (1997), http://info.wsj.com/college/glossary/journalism.pdf), and relying entirely on the court's innate understanding of the word, see Branzburg v. Pound, 461 S.W.2d 345, 347 (Ky. 1970), aff'd sub nom. Branzburg v. Hayes, 408 U.S. 665 (1972). Despite the variety of approaches, these states have reached a consensus that "source" is an expansive term. See Indiana Newspapers Inc., 963 N.E.2d at 547 ("Source in the journalistic world is a term of art meaning a person, record, document, or event that gives information to a reporter in order to help write or decide to write a story."); Branzburg, 461 S.W.2d at 347 ("Information as used in the statute refers to the things or the matters which a reporter learns and source refers to the method by which or to the person from whom he learns them."); Svoboda, 805 N.E.2d at 567 ("Thus, a 'source' is 'a point of origin' or one who initiates or supplies 'information.'"); Taylor, 193 A.2d at 185 ("'Source' means not only the identity of the person, *but likewise includes documents*, inanimate objects *and all source[s] of information*."). The Supreme Court of Pennsylvania subsequently refined its holding in Taylor. See Com. v. Bowden, 838 A.2d 740, 749 (2003) ("We read that case as standing only for the proposition that documents are to be considered sources where their production, even with all names redacted, could breach the confidentiality of a human source." (citing Taylor, 193 A.2d at 186)).

- 18 -

discovery includes "documents or data" in the defendants' possession. We do not interpret the exception so broadly.

The exception provides that, when a source-based defense is asserted, the shield law does not apply "with respect to the source of [such] allegedly defamatory information." Tenn. Code Ann. § 24-1-208(b). This language from section 208(b) limits the scope of the exception in the following ways: (1) the exception applies only to defamation cases; (2) the exception applies only if the defendant asserts a defense based on the source of information; (3) the exception only allows the compelled disclosure of sources and not information; and (4) the exception specifies that the source that must be disclosed is only the source of the allegedly defamatory information—it does not apply to all of the sources of all of the information that a media defendant may have researched when preparing a news report. Thus, contrary to the plaintiff's assertions, the scope of the exception is far narrower than the scope of the shield law's protection. Compare Tenn. Code Ann. § 24-1-208(a), with Tenn. Code Ann. § 24-1-208(b).

Our interpretation does *not* mean that, if the source of information is a document, a defendant must provide the plaintiff with the document in addition to identifying the document. We agree with the defendants that this interpretation would obliterate the statute's clear distinction between "information" and "source of information." Tenn. Code Ann. § 24-1-208(a). A source is the means by which a reporter obtains information. For example, a source may be a person the reporter interviewed or a document the reporter read. But information is what the reporter learned from the interview or the document. Thus, the exception to the shield law allows a court to compel disclosure of the source of a media defendant's information—*how* media defendants know something; it does not authorize a court to compel media defendants to disclose the information the source provided. Tenn. Code Ann. § 24-1-208(b). A plaintiff may only obtain compelled disclosure of the "information" the media defendant acquired from the source by making the previously discussed three-part showing set out in another section of the shield law, Tennessee Code Annotated section 208(c)(2)(A)–(C). This portion of the statute provides that a plaintiff must demonstrate that the information is "clearly relevant," that the information is not reasonably available from sources other than the media defendant, and that the people of Tennessee have a "compelling and overriding public interest" in learning the information. Id.; see also Henderson v. People, 879 P.2d 383, 393 (Colo. 1994) (finding that a reporter could not be required to testify about information that could be obtained from other sources such as Federal Aviation Administration records); State v. Smith, No. 00-1553 F, 2001 WL 1750827, at *1 (Fla. Cir. Ct. Mar. 15, 2001) (finding that a newspaper did not have to disclose a letter that was the basis for one of its articles because a different letter that was already filed with the court provided information similar to the information contained in the letter that was in the newspaper's possession); WBAL-TV Div., Hearst Corp. v. State, 477 A.2d 776, 782 (Md. 1984) (finding that a news station had to disclose certain video

tapes because the information contained in the video tapes was not available from any other source).[8]

Of course, assertion of the fair report privilege will necessarily entail disclosure of the media defendant's source of information. This is because a media defendant asserting the privilege must show that the allegedly defamatory information is a fair and accurate report of official actions or proceedings, and therefore, the media defendant must disclose the source of the allegedly defamatory information. See Bufalino v. Associated Press, 692 F.2d 266, 272 (2d Cir. 1982) ("Without knowledge of the identities of the persons to whom [the news gatherer] spoke, it is impossible to say whether their statements constituted official action within the scope of the [fair report] privilege."). The defendants have disclosed in detail the circumstances of the judicial proceeding where the allegedly defamatory statements originated. On remand, the trial court will have to determine whether these disclosures amount to a sufficient description of the source of information in accordance with our interpretation of Tennessee Code Annotated section 24-1-208(b). The trial court may not under the auspices of the shield law order the media defendants to disclose the information obtained from these sources unless the plaintiff satisfies the three-part test of Tennessee Code Annotated section 24-1-208(c)(2)(A)–(C).

## IV. Conclusion

For the reasons stated herein, we affirm the judgment of the Court of Appeals that the trial court erred by granting the plaintiff's motion to compel. We remand this matter to the trial court. Costs of this appeal are taxed to Glenn R. Funk for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

[8] Any Court of Appeals' opinions that conflict with this holding are overruled. See, e.g., Jones v. Hays, No. W2005-00991-COA-R3-CV, 2006 WL 6108678, at *1 (Tenn. Ct. App. July 11, 2006) ("[N]o privilege exists for the non-disclosure of information or sources in a civil action involving defamation . . . ."); Fed. Ins. Co. v. Arthur Andersen & Co., No. 89-380-II, 1990 WL 73924, at *2 (Tenn. Ct. App. June 6, 1990) ("[T]he newsgatherer's shield statute does not apply in actions for defamation against the newsperson . . . ." (citation omitted)).