# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 3, 2019 Session

## JEFFERY TODD BURKE v. SPARTA NEWSPAPERS, INC.

**Appeal by Permission from the Court of Appeals**
**Circuit Court for White County**
**No. CC-2605          Amy V. Hollars, Judge**

_____

### No. M2016-01065-SC-R11-CV

_____

This appeal requires us to determine whether the fair report privilege applies to a nonpublic, one-on-one conversation between a newspaper reporter and a detective of a county sheriff's department, who also served as the public information officer for the sheriff's department. The plaintiff sued the newspaper alleging that it had published defamatory statements the detective made about the plaintiff during the nonpublic, one-on-one conversation with the reporter. The newspaper moved for summary judgment based on the fair report privilege. The trial court granted the newspaper summary judgment, but the Court of Appeals reversed. We hold that the fair report privilege applies only to public proceedings or official actions of government that have been made public and does not apply to the nonpublic, one-on-one conversation at issue here. On this basis alone we affirm the judgment of the Court of Appeals reversing the trial court's decision granting the defendant summary judgment and remand to the trial court for further proceedings.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals**
**Affirmed and Case Remanded to the Trial Court**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which JEFFREY S. BIVINS, C.J., and SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Lucian T. Pera, Phillip Michael Kirkpatrick, and J. Bennett Fox, Jr., Nashville, Tennessee, for the appellant, Sparta Newspapers, Incorporated.

Edmund S. Sauer, Brian R. Epling, and Caroline D. Spore, Nashville, Tennessee, and W.I. Howell Acuff, Cookeville, Tennessee, for the appellee, Jeffery Todd Burke.

Douglas R. Pierce, Nashville, Tennessee, for the amicus curiae, Tennessee Association of Broadcasters.

Paul R. McAdoo, Nashville, Tennessee, for the amici curiae, The Associated Press, Cable News Network, Inc., Cox Media Group Northeast, LLC D/B/A WHBQ-TV, The E.W. Scripps Company, Gannett Co., Inc., Gatehouse Media, LLC, Gray Television, Inc., Meredith Corporation, Nexstar Media Group, Inc., Raycom Media, Inc., Reporters Committee for Freedom of the Press, Sinclair Broadcast Group, Inc., TEGNA Inc., and Tribune Media Company.

Richard L. Hollow, Knoxville, Tennessee, for the amicus curiae, Tennessee Press Association.

Amy Farrar, Murfreesboro, Tennessee, and Rodney A. Smolla, Wilmington, Delaware, for the amici curiae, David A. Elder and Rodney A. Smolla.

## OPINION

### I. Factual and Procedural Background

The facts relevant to the issue in this appeal are undisputed. On January 30, 2014, The Expositor, a newspaper of general circulation published twice weekly in White County, Tennessee, ran an article in its online and print editions which reported on the indictment and arrest of Jeffery Todd Burke. A staff writer with the newspaper, Pamela Claytor, wrote the article. The article reported that Mr. Burke had served as a middleman between a local youth football league and a cookie dough fundraising company, that the football league had collected and given "more than $16,000" to Mr. Burke for cookie dough orders, that Mr. Burke "had misappropriated" the money and had "never turned that money over to the fundraiser company," and that the football league "[had] never received the cookie dough they had sold and collected money for." The article additionally reported that Mr. Burke had been indicted "at the January meeting of the Grand Jury . . . for theft over $10,000," and had been arrested in White County on January 24, 2014, but subsequently released on $10,000 bond. The article also stated that Mr. Burke had been previously indicted in Smith County "for allegedly stealing $11,000 . . . from a youth football league last fall." The article quoted "the case's lead investigator, Detective Chris Isom, of the White County Sheriff's Office," who gave his personal assessment of the strength of the case, stating: "We are happy with the case." The article ended with another quote from Detective Isom, who said: "We are trying to get justice for these kids. It's a shame that kids have to learn a lesson like this so early."

The same day the newspaper published the article, Mr. Burke's attorney emailed Ms. Claytor and advised that the allegations related to the White County youth football league were "seriously inaccurate." Mr. Burke's attorney advised that the youth football league "did, in fact, receive everything that was ordered." The next day, the editor of The Expositor responded by email to Mr. Burke's attorney. The editor stated that the information in the article came directly from Detective Isom, "a quotable source," and that the newspaper would run corrections only if Detective Isom verified that there actually were inaccuracies in the article. The editor advised that Detective Isom had identified only one fact that needed clarification, which was that the amount of money involved was $11,000 instead of $16,000. Because Detective Isom had verified "that the other information [reported] was accurate according to the investigation," the newspaper stood by the remainder of the story.

By an email reply later that same day, Mr. Burke's attorney urged the editor to contact the youth football league. Mr. Burke's attorney stated that Mr. Burke actually had delivered everything the youth league had ordered. Mr. Burke's attorney characterized the matter as delays in the performance of a contract and offered to discuss the situation with the editor. By a second email later that same day, Mr. Burke's attorney advised that, even if the newspaper revised the monetary amount from $16,000 to $11,000, the revision would not correct the error because Mr. Burke had delivered all the product ordered and therefore had not stolen any amount of money. So far as the record on appeal reflects, there were no further communications between the editor and Mr. Burke's attorney.

On January 30, 2015, Mr. Burke filed suit against Sparta Newspapers, Incorporated ("Sparta Newspapers"), the publisher of The Expositor, in the Circuit Court for White County, Tennessee. Mr. Burke alleged that both the print and online editions of the January 30, 2014 article contained three "errors of fact that cast [Mr. Burke] in a false light and are damaging to his personal and vocational reputation": (1) the amount of money involved; (2) the statement that the cookie dough was never delivered; and (3) the statement that the Plaintiff failed to deliver the collected funds to the fundraising company. According to Mr. Burke's complaint, his performance under the contract "was delayed," but the cookie dough was ultimately delivered to the youth football league more than two months before the matter was presented to the White County Grand Jury. Mr. Burke also alleged that The Expositor never printed a correction or retraction of the errors in the story in either its print or online edition. Mr. Burke asserted that as a result of the defamatory article, he lost his job, sustained damage to his personal and vocational reputation, and suffered serious emotional strain and duress. Mr. Burke requested compensatory damages of no greater than $250,000.00 and punitive damages of $1.00.

After Sparta Newspapers answered the complaint and the parties engaged in other pretrial litigation not relevant to this appeal, Sparta Newspapers moved for summary judgment, asserting immunity from liability based on the fair report privilege. Sparta Newspapers argued that the privilege applied because the article was a fair and accurate report of the statements Detective Isom made to Ms. Claytor in his official capacity both as lead detective and as public information officer for the White County Sheriff's Department.[1] Sparta Newspapers contended that the fair report privilege applied, even though Detective Isom made the allegedly defamatory statements in a nonpublic, one-on-one conversation with its reporter. Sparta Newspapers supported its motion for summary judgment with affidavits from Ms. Claytor and Detective Isom, who both confirmed that Detective Isom made the allegedly defamatory statements in a nonpublic, one-on-one conversation. Detective Isom also stated: "The White County Sheriff's Office, including me as the Public Information Officer for that office, regularly provides interviews, statements and releases of information regarding indictments and arrests to media outlets, including The Expositor, in an effort to inform and protect the public."

Mr. Burke filed a response in opposition to the motion for summary judgment and argued that Detective Isom was not acting in his capacity as public information officer when he talked with the reporter, and he pointed out that Detective Isom never sent any documents or press releases concerning Mr. Burke to The Expositor or to any other media outlet. Mr. Burke also argued that, even assuming Detective Isom was acting in his official capacity, the fair report privilege still did not apply because the statements he made in the nonpublic, one-on-one conversation included information in addition to the information available in the public records of Mr. Burke's arrest and indictment.[2]

The trial court held a hearing on the motion for summary judgment, and subsequently, on April 19, 2016, entered a written order granting Sparta Newspapers summary judgment. The trial court specifically found that the "one-on-one interview conducted by [Ms. Claytor] of Public Information Officer and Detective Chris Isom of the White County Sheriff's Department" satisfied "the 'official' prong" of the fair report privilege.

---

[1] Sparta Newspapers also argued in its motion for summary judgment that Mr. Burke was a limited-purpose public figure and had failed to plead and could not prove actual malice. The trial court did not base its decision on these arguments, and they are not at issue in this appeal.

[2] Mr. Burke also argued that the newspaper's failure to "make further inquiry . . . in the face of multiple emails from counsel" constituted actual malice that defeated the fair report privilege. The trial court rejected this argument, and we need not address it given our recent decision holding that actual malice does not defeat the fair report privilege. Funk v. Scripps Media, Inc., 570 S.W.3d 205, 207 (Tenn. 2019).

The Plaintiff appealed, and the Court of Appeals reversed. Burke v. Sparta Newspapers, Inc., No. M2016-01065-COA-R3-CV, 2018 WL 3530839, at *1 (Tenn. Ct. App. July 23, 2018). The Court of Appeals held that "the interview given by Detective Isom was not itself an official action, official proceeding, or public meeting within the scope of the fair report privilege." Id. at *5. The intermediate appellate court explained that Tennessee courts "have not extended the fair report privilege so far as to include a private, one-on-one interview as an official action." Id. Relying on its own prior decisions, the Court of Appeals reiterated that "[t]he requirement that official actions or proceedings be open to the public serves the underlying rationale behind the privilege, allowing the press to be 'the eyes and ears of the members of the public who would have been able to witness the proceeding or obtain the information had they been present to see or hear for themselves.'" Id. at *3 (quoting Lewis v. NewsChannel 5 Network, L.P., 238 S.W.3d 270, 285 (Tenn. Ct. App. 2007)).

Sparta Newspapers then applied for permission to appeal to this Court, and we granted the application to consider the scope of the fair report privilege. Burke v. Sparta Newspapers, Inc., No. M2016-01065-SC-R11-CV (Tenn. Jan. 17, 2019) (order granting permission to appeal).[3]

## II. Standard of Review

We review a lower court's ruling on a motion for summary judgment de novo without a presumption of correctness afforded the trial court's decision. Rye v. Women's Care Ctr. of Memphis, MPLLC, 477 S.W.3d 235, 250 (Tenn. 2015) (citing Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997)). We "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." Id. at 250 (citing In re Estate of Brown, 402 S.W.3d 193, 198 (Tenn. 2013)). Summary

---

[3] In the order granting the application for permission to appeal, we limited our consideration to the following three issues:

1. Whether the Court of Appeals' holding in the Opinion that a fair and accurate report of on-the-record statements made by a sheriff's department public information officer about a pending criminal case during an interview with a newspaper reporter does not qualify for protection under Tennessee's fair report privilege is contrary to Tennessee law.

2. Whether the Court of Appeals' analysis of the supposed "distinction between reports of official actions or proceedings on the one hand and sources within the government on the other" is contrary to Tennessee law.

3. Whether the Court of Appeals' requirement imposed by the Opinion that, "[t]o rely on the fair report privilege, the article should be written in such a manner that an average reader can 'understand the article (or the pertinent section thereof) to be a report on or summary of an official document or proceeding,'" is contrary to Tennessee law.

- 5 -

judgment is appropriate under Rule 56 when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. In this appeal, the relevant facts are undisputed. Our task is to determine whether the fair report privilege applies to these undisputed facts and entitles Sparta Newspapers to summary judgment as a matter of law.

### III. Analysis

Tennessee recognized the fair report privilege more than a century ago, Saunders v. Baxter, 53 Tenn. 369, 382-83 (1871), yet this Court had not discussed the privilege in many years until our recent decision in Funk v. Scripps Media, Inc., which was released *after* the trial court and the Court of Appeals ruled in this case. 570 S.W.3d 205 (Tenn. 2019). In Funk, we explained that the fair report privilege is an exception to the common law rule "that a person who repeats the defamatory statements made by another is also liable for defamation." Funk, 570 S.W.3d at 211 (citing VI Matthew Bacon with Henry G. William and Bird Wilson, A New Abridgment of the Law 238-39 (Philadelphia, Philip H. Nicklin 1813); Dameron v. Washington Magazine, Inc., 779 F.2d 736, 739 (D.C. Cir. 1985)); see also Restatement (Second) of Torts § 578 (1977) ("[O]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it."); Rodney A. Smolla, 2 Law of Defamation § 8:3 (2d ed. May 2019 update) [hereinafter Smolla at § ___) ("[T]he fair report privilege is an exception to the normal common-law rule rendering a speaker liable for republication of another's defamatory statement."). We recognized that the privilege originally applied only to the republication of allegedly defamatory statements made during judicial proceedings, but noted that American courts, including courts in Tennessee, later expanded it to apply to reports about a variety of official actions and proceedings. Funk, 570 S.W.3d at 211 (citing David Elder, Defamation: A Lawyer's Guide § 3:1 (July 2018 update)); see also Lewis, 238 S.W.3d at 285 (providing examples of the official actions and proceedings to which the privilege has been applied). We reiterated that the original rationale for the privilege was that liability should not be imposed on those who republish allegedly defamatory statements made during judicial proceedings that are "'open to all the world.'" Funk, 570 S.W.3d at 211 (quoting Curry v. Walter, 126 Eng. Rep. 1046 (C.P. 1769)). In other words, the basis of the fair report privilege is "the interest of the public in having information made available to it as to what occurs in official proceedings and public meetings." Restatement (Second) of Torts § 611 cmt. a (1977); see also Smolla at § 8.67 ("The rationale for the privilege is of considerable vintage, but remains as relevant as ever: The reporter is a surrogate for the public, permitting it to observe through the reporter's eyes how the business of government is being conducted."). We reaffirmed that Tennessee courts also have relied upon this rationale when applying the privilege. Funk, 570 S.W.3d at 211 (stating that "newspapers should be allowed to report on publicly accessible information" (citing David Elder, Defamation: A Lawyer's Guide §

3:1 (July 2018 update)); Lewis, 238 S.W.3d 270 (stating that the privilege allows "the media and others to be the eyes and ears of the members of the public who would have been able to witness the proceeding or obtain the information had they been present to see or hear for themselves"); Smith v. Reed, 944 S.W.2d 623, 625 (Tenn. Ct. App. 1996) (stating that the fair report privilege was recognized "in order that members of the public may be apprised of what takes place in [judicial] proceedings without having been present"). We further acknowledged that a second justification for the fair report privilege is that it "facilitates the worthwhile goal of public supervision of official actions or proceedings." Funk, 570 S.W.3d at 211-12 (citing David Elder, Defamation: A Lawyer's Guide § 3:1 (July 2018 update); Cox Broad. Corp. v. Cohn, 420 U.S. 469, 492 (1975)); see also Am. Publ'g Co. v. Gamble, 90 S.W. 1005, 1008 (Tenn. 1906) (stating that the privilege allows the public to "have the means of knowing how the duties of their officers are performed, whether faithfully and intelligently or otherwise").

We then turned our attention in Funk to defining the fair report privilege. We noted that in Tennessee, as in most other jurisdictions, the privilege had traditionally been applied to fair and accurate reports of official actions or proceedings but only so long as the reports were *not* made with express malice—in other words, so long as the reports were *not* made for the purpose of harming the person defamed in the official action or proceeding. Funk, 570 S.W.3d at 212, 214. After reconsidering the traditional approach in light of developments in defamation law, including the United States Supreme Court's decisions in New York Times Co. v. Sullivan, 376 U.S. 254 (1964) and Garrison v. State of Louisiana, 379 U.S. 64 (1964), we abandoned the traditional formulation of the fair report privilege to the extent a showing of express malice could defeat the privilege. Funk, 570 S.W.3d at 214-16. In its place we "adopt[ed] the approach of the Restatement (Second) of Torts section 611" to the fair report privilege. Id. at 217.

Therefore, to determine whether the fair report privilege applies to the undisputed facts in this appeal, we turn to Section 611, which states: "The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." Restatement (Second) of Torts section 611.[4] The undisputed facts establish that the nonpublic, one-on-one conversation between Detective Isom and Ms. Claytor was not "a meeting open to the public that deal[t] with a matter of public concern." The fair report privilege applies here, then, only if the nonpublic, one-on-one conversation constituted "an official action or proceeding."

---

[4] We note that even before we adopted section 611 in Funk, the Court of Appeals had repeatedly relied upon it when addressing the fair report privilege. See, e.g., Lewis, 238 S.W.3d at 285.

The text of Section 611 does not answer the question of whether a nonpublic, one-on-one conversation is an official action or proceeding. Nor do the comments to Section 611 provide a definitive answer to this question. Indeed, comment d to Section 611 states: "It is not clear whether the privilege extends to a report of an official proceeding that is not public or available to the public under the law." Restatement (Second) of Torts section 611 cmt. d. Not surprisingly then, both parties to this appeal, as well as the amici curiae, have located and analyzed authority from other jurisdictions supporting their respective positions either for or against expanding the fair report privilege to the nonpublic, one-on-one conversation at issue here. This authority illustrates that the fair report privilege is raised in a variety of factual situations and that, as comment d to Section 611 indicates, courts in other jurisdictions disagree on its scope.[5]

In contrast to the disagreement existing elsewhere, however, the Court of Appeals has consistently held that the fair report privilege in Tennessee is "limited to circumstances involving public proceedings or official actions of government that have been made public." Lewis, 238 S.W.3d at 285; Eisenstein v. WTVF-TV News Channel 5 Network, 389 S.W.3d 313, 323 (Tenn. Ct. App. 2012) (quoting Lewis for the scope of the privilege); Grant v. Commercial Appeal, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *6 (Tenn. Ct. App. Sept. 18, 2015) (quoting Lewis for the scope of the privilege).[6] The Court of Appeals has declined to expand the fair report privilege to "the 'myriad types of informal reports and official and unofficial investigations, contacts, and communications of law enforcement personnel at all levels of the state and federal

---

[5] Compare Medico v. Time, Inc., 643 F.2d 134 (3d Cir. 1981) (extending the fair report privilege to confidential FBI reports in a case involving alleged criminal activities of a member of the United States Congress), with Thomas v. Tel. Publ'g Co., 929 A.2d 993, 1010 (N.H. 2007) (declining to apply the fair report privilege when the information reported "came from private conversations" between a reporter and officers and "went well beyond the fact of the plaintiff's arrest and the grounds for the charge" and included "the officers' comments referenc[ing] related investigations and the plaintiff's prior criminal history"); Phillips v. Evening Star Newspaper, 424 A.2d 78, 89 (D.C. 1980) (refusing to apply the fair report privilege to reports based on the public information officer's "hot line" recording that "represent[ed] little more than an informal arrangement between the police and the media, a joint venture, which consists of nothing more sanctified than unofficial statements of police regarding a crime"); Wiemer v. Rankin, 790 P.2d 347, 354 (Idaho 1990) (refusing to apply the fair report privilege to "private statements of police officers made to members of the news media"); Kelley v. Hearst Corp., 157 N.Y.S.2d 498, 502 (N.Y App. Div. 1956) (holding that "[t]the narration in private to newspaper reporters by police officers of facts of other persons is not 'a public and official proceeding'" to which the fair report privilege applies). See also Smolla at § 8:72 (discussing the proceedings to which the fair report privilege has been applied); 2 Fowler V. Harper, et al., Harper, James and Gray on Torts § 5.24 at 244-45 (3d ed. 2006) ("A conversation between a reporter and a detective is not a public event that requires, or merits, coverage under this privilege.").

[6] Any language in these Court of Appeals' decisions which indicates that the fair report privilege may be defeated by a showing of express (actual) malice has been abrogated by our holding in Funk.

bureaucracy with local, regional, and national media.'" Lewis, 238 S.W.3d at 286-87 (quoting David A. Elder, Defamation: A Lawyer's Guide § 3:10, at 3–30–3:31 (2003)).

We agree with the Court of Appeals that the fair report privilege encompasses only *public* proceedings or official actions of government that have been made *public*. Lewis, 238 S.W.3d at 285. As we noted in Funk, a statement to which the privilege applies "is worthy of public notice, not only because of the contents of the statement but also because of the *context* in which it was made." Funk, 570 S.W.3d at 216 (emphasis added). Defining the fair report privilege as applying only to public proceedings or official actions of government that have been made public still enables newspapers and other outlets "to be the eyes and ears of the members of the public who would have been able to witness the proceeding or obtain the information had they been present to see or hear for themselves." Lewis, 238 S.W.3d at 285. But, at the same time, this limitation ensures that the fair report privilege remains closely connected to the rationale from which it originated—"the public's interest in being informed of official actions or proceedings that are themselves public." Id. (citing Restatement (Second) of Torts § 611 cmt. a; David A. Elder, Defamation: A Lawyer's Guide § 3:12, at 3–38–3–39, 3–42 (2003)).

Limiting the privilege to public proceedings or official actions of the government that have been made public also is consistent with, and indeed complementary to, our recent decision in Funk, where we held that "the privilege can only be defeated by showing that a report about an official action or proceeding was unfair or inaccurate." Funk, 570 S.W.3d at 217. Records are generated of public proceedings or official actions of government that have been made public. Any report on a public proceeding or official action of government that has been made public can be compared to the record. By this comparison, judges and lawyers can readily determine whether such a report is fair and accurate and entitled to the protection of the privilege. On the other hand, lawyers, judges, and litigants would have no objective means of determining the fairness and accuracy of a report derived from a nonpublic, one-on-one conversation. Only the parties would know what was said during the conversation. In such circumstances, every assertion of the fair report privilege would require testimony from the parties to the conversation and an assessment of their credibility in the context of litigation to determine whether the report was fair and accurate.

In sum, we conclude that expanding the fair report privilege to nonpublic, one-on-one conversations would constitute a departure both from the rationale on which the privilege is based and from existing Tennessee law defining its scope and that such an expansion would unnecessarily complicate the task of determining whether a report should be protected by the privilege. For all these reasons, we hold that the fair report privilege applies only to public proceedings or official actions of government that have been made public.

Applying this holding to the undisputed facts, we conclude that the fair report privilege does not apply to the report at issue in this appeal. The nonpublic, one-on-one conversation between Ms. Claytor and Detective Isom was neither a public proceeding nor an official action of the government that had been made public.[7]

It is worth emphasizing, however, that our holding here does not resolve the question of whether a press conference or a press release constitutes a public proceeding or an official action of government that has been made public. Although Detective Isom stated in his affidavit that he "routinely" issues press releases, it is undisputed that none was issued here. Additionally, because our decision is based on the context in which Detective Isom made his remarks to Ms. Claytor, we need not and do not address how, if at all, comment h to Section 611 of the Restatement (Second) of Torts would apply had the context been different.[8] Finally, our holding that the fair report privilege does not apply in these circumstances does not impose liability on Sparta Newspapers or in any way foreclose Sparta Newspapers from raising other available defenses on remand. See Phillips, 424 A.2d at 90 (stating that the privilege's inapplicability did not foreclose the newspaper from raising other defenses to the defamation claim).

## IV. Conclusion

For the reason stated herein, we affirm the judgment of the Court of Appeals reversing the trial court's decision granting summary judgment to Sparta Newspapers. We remand this matter to the trial court for further proceedings. Costs of this appeal are taxed to Sparta Newspapers, Incorporated for which execution may issue if necessary.

---

CORNELIA A. CLARK, JUSTICE

---

[7] Our resolution of this issue makes it unnecessary to resolve the other two issues set out in the order granting Sparta Newspapers' application for permission to appeal.

[8] Comment h states:

Arrest. An arrest by an officer is an official action, and a report of the fact of the arrest or of the charge of crime made by the officer in making or returning the arrest is therefore within the conditional privilege covered by this Section. On the other hand statements made by the police or by the complainant or other witnesses or by the prosecuting attorney as to the facts of the case or the evidence expected to be given are not yet part of the judicial proceeding or of the arrest itself and are not privileged under this Section.