FILED
09/19/2024
Clerk of the
Appellate Courts

# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### February 8, 2023 Session

## SMILEDIRECTCLUB, INC., ET AL. v. NBCUNIVERSAL MEDIA, LLC, ET AL.

### Appeal from the Circuit Court for Davidson County
### No. 20C1054   Thomas W. Brothers, Judge
_____

### No. M2021-01491-COA-R3-CV
_____

This is an action for defamation and violation of the Tennessee Consumer Protection Act ("the TCPA"). The plaintiffs operated a teledentistry platform dedicated to providing remote treatment for mild-to-moderate malocclusion of the teeth. The defendants published an online article and broadcast an "investigative report" that alleged, *inter alia*, that the plaintiffs' customers were experiencing "painful problems" such as nerve damage, joint damage, and loss of teeth. In their complaint, the plaintiffs argued these and other statements—as well as the implications derived from those statements—injured the plaintiffs' reputation and disparaged the plaintiffs' products, services, and business. The trial court dismissed the action under the Tennessee Public Participation Act ("the TPPA"), holding that the TCPA did not apply and that the plaintiffs failed to make a prima facie case for their defamation claims. This appeal followed. Considering the evidence in a light most favorable to the plaintiffs and disregarding all countervailing evidence, we have determined that the plaintiffs presented prima facie evidence of falsity to support some of their claims but failed to produce clear and convincing evidence of actual malice. Accordingly, we affirm the judgment of the trial court. Defendants ask for an award of their appellate attorney's fees under Tennessee Code Annotated § 20-17-107, which requires an award of costs and fees "[i]f the court dismisses a legal action pursuant to a petition filed under [the TPPA]." Because we have affirmed the dismissal of the plaintiffs' claims under the TPPA, Defendants are entitled to an award to be determined by the trial court on remand.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which W. NEAL MCBRAYER and KRISTI M. DAVIS, JJ., joined.

J. Erik Connolly and Nicole E. Wrigley, *pro hac vice*, Chicago, Illinois, and John R. Jacobsen and Katharine R. Klein, Nashville, Tennessee, for the appellant, Cluster Holdco, LLC.[1]

William J. Harbison, II; Ronald George Harris; and James F. Sanders, Nashville, Tennessee, and Jonathan D. Hacker, *pro hac vice*, Washington, DC, and Daniel M. Petrocelli, *pro hac vice*, Los Angeles, California, for the appellees, NBCUniversal Media, LLC, and Vicky Nguyen.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; and Janet M. Kleinfelter, Deputy Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

### I. SMILEDIRECTCLUB

SmileDirectClub ("SDC") operated a telehealth platform for remote treatment of mild-to-moderate malocclusion of the teeth, i.e., misaligned teeth. When signing up, prospective patients gave SDC their health history and executed a consent form in which the patient warranted, *inter alia*, that he or she had seen a dentist within the last six months. SDC matched each patient with one of its "affiliated" dentists for review.

If the dentist approved the patient for treatment, SDC used impressions or photos of the patient's teeth to create a 3-D model. SDC then drafted a proposed treatment plan to gradually shift the patient's teeth with a series of custom-made plastic aligners. If the patient's SDC-affiliated dentist approved the treatment plan, SDC would arrange for the aligners to be manufactured by a dental lab and sent directly to the patient.

---

[1] Oral argument for this case was heard on February 8, 2023. Thereafter, SmileDirectClub, Inc., SmileDirectClub, LLC, and other affiliated entities petitioned for bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of Texas. *See In re SmileDirectClub, Inc.*, No. 23-90786 (CML) (Bankr. S.D. Tex.). Thus, on December 1, 2023, we entered an order staying the proceedings. *See Cathey v. Johns-Manville Sales Corp.*, 711 F.2d 60, 61 (6th Cir. 1983) (a petition for bankruptcy relief "automatically stays all proceedings against the debtor" (citing 11 U.S.C. § 362(a)(1))). In May 2024, the bankruptcy court gave Cluster Holdco, LLC, sole and exclusive authority and standing to investigate, file, prosecute, settle or release, arrange financing for, retain professionals (including counsel), and/or otherwise administer all matters in relation to the SDC entities' claims and causes of action. Accordingly, on August 6, 2024, this court lifted the stay of proceedings and substituted Cluster Holdco, LLC, in place of appellants SmileDirectClub, Inc., SDC Financial, LLC, and SmileDirect, LLC.

At the beginning of treatment and periodically thereafter, each patient was instructed to send photos of his or her teeth to SDC. The assigned dentist or a member of SDC's "Dental Team" would review the photos to ensure the aligners fit properly and that the patient's teeth were moving correctly. SDC's Dental Team also handled all patient questions and concerns except for those involving "clinical" issues, which were forwarded to the patient's SDC-affiliated dentist. Once the patient finished each phase of the prescribed aligners, his or her SDC-affiliated dentist would review the patient's most recent photos to determine whether further treatment was necessary.

By using this novel approach to aligner treatment, SDC could provide its products and services for much less than the cost of traditional braces.

## II. NBC REPORTS

In November 2019, NBC producer Lauren Dunn and NBC "investigative and consumer correspondent" Vicky Nguyen began looking into rumors that some patients suffered serious complications from using SDC's aligners. The "investigation" culminated in two reports: an article published to the Health News section of NBCNews.com ("the Article") and a video segment broadcast on NBC Nightly News with Lester Holt ("the Broadcast") (collectively, "the Reports"). Each was published on February 13, 2020.

## A. Article

The Article reported that "an NBC News investigation into a growing list of complaints found this new trend in teeth straightening is leading to painful problems for some people." It moved forward by telling the story of two former patients, interspersed with narrative from Ms. Nguyen and excerpts from interviews with a professor of orthodontics and SDC's chief legal counsel:

> Anna Rosemond was drawn to the advertisements for SmileDirectClub, which promises to straighten teeth for under $2,000—about a third the cost or traditional braces—in as little as six months and all from the comfort of home.
>
> "It seemed like a really simple, easy way that they were offering people to straighten their teeth," said Rosemond of Richmond, Virginia.
>
> Rosemond ordered one of the kits and took an impression of her teeth with the putty and tray she received.
>
> To get started, SmileDirectClub customers either can get a 3D image of their teeth in one of its SmileShops or have an at-home kit sent to them. A few weeks later, she received dental aligners and followed the instructions to send in photos of her mouth every 90 days. SmileDirectClub told her the treatment

would be reviewed remotely by one of its 250 dentists and orthodontists. All of her care was done online, she said.

After a year, Rosemond was in pain.

"I really noticed that things didn't feel right with the bite," Rosemond said. "My head was hurting frequently."

She'd been assured that she'd be able to get in touch with her assigned dentist, but after multiple attempts, she said she was never connected, nor given contact information. So she consulted an outside orthodontist, who diagnosed her with a cross[ ]bite, or misalignment, possibly caused by the aligners. What's more, her orthodontist said the cross[ ]bite was causing other symptoms: strain in her neck and jaw muscles, which led to migraines.

Rosemond, who says she tried SmileDirectClub because of the money she thought she'd save, wound up spending thousands on traditional braces to fix her teeth.

While SmileDirectClub, the largest at home dental alignment company, and others promise to leave patients smiling, an NBC News investigation into a growing list of complaints found that this new trend in straightening teeth is leading to painful problems for some people.

The Better Business Bureau reports more than 1,800 complaints nationwide involving SmileDirectClub. Most of the complaints involve customer service issues-such as broken aligners, delivery issues and payment problems-but dozens describe concerns about treatment results: complaints like broken teeth and nerve damage.

Last month, nine members of Congress asked the Food and Drug Administration and the Federal Trade Commission to investigate SmileDirectClub "to ensure that it is not misleading consumers or causing patient harm."

And in January, in an effort to protect patients, a law went into effect in California requiring all teledentistry patients to get an X-ray before undergoing online aligner treatment. Virginia is considering similar rules.

Dr. Chung Kau, chairman and professor of orthodontics at the University of Alabama in Birmingham, said moving teeth without in-person supervision can lead to permanent harm.

Problems with a person's bite aren't just cosmetic. "If you can't get a proper bite, that affects the entire function of your jaw," Kau said. "You could get migraines, jaw joint problems, [and] disintegration of your joints."

"This harm is irreparable. I want to state that," he said. "It's because things like bone loss, disease, loss of a tooth—you can't put it back in the mouth."

That's what happened to Tom Harwood, 40, of Winnemucca, Nevada. Harwood told NBC News that his dentist said the SmileDirectClub aligners moved his teeth so fast that it caused some of them to detach from the bone.

"Now I stand to lose two to three of my bottom teeth and two to three of my front teeth," Harwood said. "Every day I wake up—it feels like I'm being punched. It's just an all day type pain."

Harwood said that he stopped his treatment after about 3 months, before the 90-day mark when customers are asked to send photos of their mouths to SmileDirectClub to monitor progress. He also said that he tried to get in touch with his assigned dentist, but that he was unable to do so.

It's important for teeth straightening patients to see an orthodontist regularly to make sure their bite is correct and their mouth is healthy overall, Kau said.

Regular visits with an orthodontist help ensure everything is on track, Kau said, "Every visit that we spend with a patient, we're constantly making adjustments so we can get the best, optimal care for the patient," he said.

SmileDirectClub said that they can't comment on individual cases like Rosemond's and Harwood's because of privacy concerns but the company's chief legal officer, Susan Greenspon-Rammelt, said the company has helped more than 750,000 people with its network of licensed dental professionals. "They're subject to the same standards of care that a doctor in a traditional setting is," she said.

But NBC News found complaints related to poor patient outcomes, including problems with bite and spacing.

Greenspon-Rammelt said that SmileDirectClub's network of dentists, not the company itself, is responsible for treatment plans, but said that undesirable results could occur if patients aren't adhering to the program correctly. "That could be because they weren't following the instructions for use, they didn't come in for a midcourse correction when they were advised to do that, they didn't follow up with the dental team," she said.

SmileDirectClub Reviews all patient scans before sending the first treatment kits, and only sends them to patients that they think are good candidates, Greenspon-Rammelt said, adding that 95 percent of people reviewed for treatment are accepted. All customers are required to see a dentist within six months before starting, which Greenspon-Rammelt says offers proof that their teeth are healthy enough for the treatment.

But NBC News hidden cameras recorded employees at SmileDirectClub shops in Ohio, New Jersey and Alabama advising potential customers they didn't have to see a dentist before starting treatment.

One employee said "it's not mandatory" to see a dentist first. Another said, "that's what the scans are for." Kau, however, said the scans are just a map of the teeth and don't provide a full picture of someone's oral health.

"That may be a Smile guide who didn't actually have or remember the proper training," Greenspon-Rammelt said in response to the videos.

Another employee said that the home impression kits used by thousands of customers who never set foot in a SmileDirectClub shop may not be reliable, and that "anything could go wrong." Greenspon-Rammelt characterized that statement as a "personal opinion" of the employee, not the company.

If customers can show the treatment didn't work and want a refund outside the return window, SmileDirectClub requires they sign a confidentiality agreement, raising the possibility that there may be more complaints than have been made public.

Greenspon-Rammelt responded that in many instances, by the time such customers are asked to sign the confidentiality agreement, "they've already gone out there, they've put this on social media, they've filed complaints," Greenspon-Rammelt said.

Harwood refused to sign that confidentiality agreement and was unable to get his money back.

"It was basically like, here's your money back, but you can't ever talk about us," he said. "It's not right. There are so many people out there putting their trust in a company that should be doing right by you, and they're not."

The Article also included a photo of Ms. Rosemond's teeth in the margins with the caption, "One of several photos of her mouth that Rosemond submitted to SmileDirectClub, which were said to be used to monitor her treatment." The Article also featured a pop-out quote from Dr. Kau, stating in large, bold letters, "This harm is irreparable. I want to state that."

## B. Broadcast

Defendants made similar claims and statements in the Broadcast, which featured narration by Ms. Nguyen and began with a montage of SDC commercials[2]:

MR HOLT: Now to our NBC news investigation and a look at a new trend in teeth straightening for much less than the cost of traditional braces. But some patients complain these at-home treatments do not leave them smiling. Here's investigative and consumer correspondent, Vicky Nguyen.

[SDC COMMERCIAL]: "This is an aligner."

[NARRATION]: The ads promise to straighten your teeth—

[SDC COMMERCIAL]: —"for up to 60% less than braces"—

[NARRATION]: —in six months on average, for under two grand.

[SDC COMMERCIAL]: "We didn't have to make any appointments."

[NARRATION]: Get a scan in the store, or a kit through the mail, do the rest from home.

MS. ROSEMOND: It seemed like a really simple, easy way that they were offering people to straighten their teeth.

[NARRATION]: Anna Rosemond ordered a kit and took an impression of her teeth.

MS. ROSEMOND: They would have you take the two different putties and mix them all together and then put it in your mouth.

[NARRATION]: A few weeks later, she received dental aligners and followed the instructions to send in photos of her mouth every 90 days. SmileDirectClub told her that treatment would be reviewed remotely by one of its 250 dentists and orthodontists.

MS. NGUYEN: So this is all done online?

MS. ROSEMOND: Yes.

---

[2] The parties refer to and rely solely on a transcript of the Broadcast. We will limit our analysis accordingly.

[NARRATION]: After a year, Anna was in pain and she says she tried but couldn't speak to her assigned dentist. So, she found an orthodontist who diagnosed her with a cross bite possibly caused by the aligners, straining her neck and jaw muscles, sparking migraines.

MS. ROSEMOND: I really noticed that things like didn't feel right with the bite, my head was hurting frequently.

[NARRATION]: SmileDirectClub says it won't discuss individual cases due to privacy concerns. There have been more than 1,800 complaints filed with the Better Business Bureau nationwide. Most are customer service issues, but dozens also include concerns about treatment results. And now, nine congressmen have asked the FDA and FTC to investigate SmileDirectClub to ensure it is not misleading consumers or causing patient harm.

[NARRATION]: Dr. Chung Kau, Chair of Orthodontics at The University of Alabama, says moving teeth without supervision in person, can lead to permanent harm.

DR. KAU: Things like bone loss, disease, loss of a tooth.

[NARRATION]: SmileDirect's Susan Greenspon-Rammelt, says the company has helped more than 750,000 people and says it isn't responsible for treatment. It relies on its licensed dentist[s].

MS. RAMMELT: They're subject to the same standards of care that a doctor in a traditional setting is. We are an industry disruptor.

MS. NGUYEN: There have been a few complaints. I'm going to go back to the BBB, where people say, "The end results caused my teeth not to bite down. 10 months later, still in limbo. My bite is worse. My back teeth don't touch on the left side." How do you answer to that?

MS. RAMMELT: That could be because they weren't following the instructions for use. They didn't come in for a mid course correction when they were advised to do that. They didn't follow up with the dental team.

[NARRATION]: She says 95 percent of people reviewed for treatment are accepted. They're required to see a dentist within six months before starting. But that's not what we found with our hidden cameras.

MS. NGUYEN: I don't have to go see a dentist first.

FEMALE 1: No.

MS. NGUYEN: If I don't want to.

FEMALE 1: If you don't want to, it's not mandatory.

MS. NGUYEN: So do I ever have to see a dentist before I start or anything like that?

FEMALE 2: I'm—so that's what—that's what our photos and stuff are for.

[NARRATION]: We showed [Ms. Rammelt-Greenspon] the video.

MS. RAMMELT: That maybe a smile guide who didn't actually have or didn't remember the proper training. I'm glad you brought this to my attention.

[NARRATION]: This employee told us the at-home impression kits may not be reliable.

FEMALE 3: I mean, even as a dental assistant, there's always prone for human error. Taking them and especially relying on somebody who's never done them before to do it, anything could go wrong.

MS. RAMMELT: That's her personal opinion. That is not a company opinion.

[NARRATION]: If customers can show the treatment didn't work and want a refund outside the return window, they're required to sign a confidentiality agreement.

[MS. NGUYEN:] Is it possible there are many more complaints about SmileDirectClub that the public doesn't know about because you require unhappy customers to sign these nondisclosure agreements?

MS. RAMMELT: I think that's a loaded question. Is it possible? Of course it's possible, but I would tell you that in many instances, by the time these people are asked to sign, they've already gone out there. They've put this on social media. They've filed complaints.

[NARRATION]: Anna says she never got a refund and wound up spending thousands more to fix her teeth.

MR. HOLT: So Vicky, orthodontists are clearly worried about their patients and also maybe their business. But where do regulators come down on all this?

MS. NGUYEN: Well Lester, California just enacted the first law that would require a dentist to look at an x-ray before anyone can start this kind of treatment. That law in California also bans those confidentiality agreements.

MR. HOLT: Alright Vicky, thanks very much.

The day after the Reports were published, SDC's market value dropped by over $950 million.

## III. COMPLAINT

In May 2020, SDC commenced this action against NBCUniversal Media, LLC, and Ms. Nguyen (collectively, "Defendants"). SDC asserted four claims for "defamation by implication" claims; nine claims for "defamation"; and one claim for disparagement of its products, services, and business under the Tennessee Consumer Protection Act of 1977 ("the TCPA"), Tenn. Code Ann. §§ 47-18-103 to -135.

Defendants responded to the complaint by filing a petition to dismiss under the Tennessee Public Participation Act ("the TPPA"), Tenn. Code Ann. §§ 20-17-101 to -110. But before Defendants' TPPA petition was heard, SDC raised a constitutional challenge to the Act, asserting that it violated the separation-of-powers doctrine and the right to a jury trial. Thus, the State of Tennessee's Attorney General's Office intervened to defend the Act.

After allowing for limited discovery, the trial court docketed two hearings: one for SDC's constitutional challenge and one for Defendants' TPPA petition, if necessary.

After the first hearing, the court held that the TPPA does not violate the right to a jury trial because, *inter alia*, the Act requires courts to make "the familiar determination of whether the facts asserted by the [p]laintiff, standing alone and unrebutted, are sufficient to support a finding for each element of the plaintiff[']s action." The court also held that the TPPA does not violate the separation-of-powers doctrine because the Act's requirements "are both reasonable and workable within the framework already adopted by the judiciary."

After the second hearing, the trial court held that SDC had made a *prima facie* case that six statements in the Reports were false and defamatory, and the court held that SDC "established a prima facie showing that it suffered actual damages." However, the court also determined that SDC was a public figure as a matter of law and thus was required to produce clear and convincing evidence that Defendants acted with actual malice. The court concluded that SDC had not met this standard:

> [R]espectfully, the Court finds that SDC has failed to establish a prima facie showing of any of the counts that it would be reasonably able to submit admissible evidence to prove malice by clear and convincing proof at the

- 10 -

summary judgment stage or at trial. At best, you've raised some questions possibly touching on being able to present proof to a degree of preponderance of the evidence. But respectfully, I just don't see that going into that high clear and convincing standard, which is required when you've got a public figure.

.     .     .

. . . That unfortunately applies to all of the 13 counts that effectively relate to defamation, even the two I didn't find were supported by the statements. I just don't see the actual malice showing that you have a reasonable probability of proving that by clear and convincing evidence at trial. Accordingly, the petition should be granted as to Counts I through XIII.

The trial court also dismissed SDC's TCPA claim on the ground that the Act did not apply to news reports:

The Court finds that SDC, respectfully, has not established a prima facie case supporting all of the essential elements of a TCPA claim, and therefore, may not avail itself of the TCPA under these circumstances. I'm guided by the plain language of Tennessee Code Annotated 47-18-102, which provides, " . . . this part shall be liberally construed to promote the following policies: . . . To protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state."

The issue here is whether the reports which were news stories published on NBC's media platform were made in the conduct of any trade or commerce. T.C.A. 47-18-103(19) defines trade or commerce as the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated. Frankly, it cannot be said that the publishing of news reports satisfies any of the criteria identified above. Accordingly, the Court can reasonably find that NBC did not engage in a trade or commerce, and therefore, SDC does not have a TCPA claim.

For these reasons, the court granted Defendant's TPPA petition and dismissed SDC's action with prejudice. This appeal followed.

### ISSUES

SDC raises four issues on appeal, which we state as follows:

1. Whether the trial court erred in dismissing SDC's defamation by implication claims when SDC presented evidence that: (1) readers and

viewers understood that Defendants' reports conveyed defamatory implications; (2) the defamatory implications were false; and (3) Defendants possessed information contradicting the defamatory implications.

2. Whether the trial court erred in dismissing SDC's defamation claims when SDC presented evidence that: (1) Defendants published false statements about SDC; (2) Defendants had reasons to doubt the credibility of its sources; and (3) Defendants had information that contradicted its statements.

3. Whether the trial court erred in dismissing SDC's claim under the TCPA, when SDC presented evidence that: (1) Defendants published false and defamatory representations about SDC; and (2) SDC suffered an ascertainable loss because of Defendants' conduct.

4. Whether the trial court erred in finding the TPPA constitutional.

Defendants do not raise any additional issues but ask for an award of reasonable appellate costs and fees under Tennessee Code Annotated § 20-17-107.

STANDARD OF REVIEW

Whether a party established a prima facie case for purposes of a TPPA petition is a legal issue we review de novo. *See Charles v. McQueen*, 693 S.W.3d 262, 272–73 (Tenn. 2024). Likewise, "[i]ssues of constitutional interpretation are questions of law, which we review de novo without any presumption of correctness given to the legal conclusions of the courts below." *J.A.C. by & through Carter v. Methodist Healthcare Memphis Hosps.*, 542 S.W.3d 502, 510 (Tenn. Ct. App. 2016) (quoting *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009)).

ANALYSIS

SDC contends that the trial court erred in two ways: (1) by denying SDC's constitutional challenge to the TPPA and (2) by holding that SDC did not make a prima facie case for each element of its claims. We will address SDC's constitutional challenge first.

I. CONSTITUTIONAL CHALLENGE

SDC contends that the TPPA violates the separation-of-powers doctrine because the Act "creates procedural rules that conflict with the Tennessee Supreme Court's notice-pleading regime" and violates the right to a jury trial because the Act "requires courts to make merit-based determinations that should be decided by a jury."

We start by observing that "our Legislature may enact any law which our Constitution does not prohibit, and the Courts of this State cannot strike down one of its statutes unless it clearly appears that such statute does contravene some provision of the Constitution." *Willeford v. Klepper*, 597 S.W.3d 454, 465 (Tenn. 2020) (citations omitted). Accordingly, when considering whether a statute contravenes the Constitution, "we begin with the presumption that an act of the General Assembly is constitutional" and "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020) (quoting *Willeford*, 597 S.W.3d at 465).

## A. Separation-of-Powers Doctrine

Article II of the Tennessee Constitution divides the state government into "three distinct departments: the legislative, executive, and judicial," and it states that "[n]o person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others." Tenn. Const. art. II, §§ 1, 2.

The judiciary has exclusive authority over court practice and procedure. *Willeford*, 597 S.W.3d at 465–66 (quoting *State v. McCoy*, 459 S.W.3d 1, 9 (Tenn. 2014)). However, "[a] legislative enactment which does not frustrate or interfere with the adjudicative function of the courts does not constitute an impermissible encroachment upon the judicial branch of government." *Lynch v. City of Jellico*, 205 S.W.3d 384, 393 (Tenn. 2006) (quoting *Underwood v. State*, 529 S.W.2d 45, 47 (Tenn. 1975)).

The judiciary may consent "to the application of procedural or evidentiary rules promulgated by the legislature" so long as those procedures "(1) are reasonable and workable within the framework already adopted by the judiciary, and (2) work to supplement the rules already promulgated by the Supreme Court." *State v. Lowe*, 552 S.W.3d 842, 856–57 (Tenn. 2018) (quoting *State v. Mallard*, 40 S.W.3d 473, 481 (Tenn 2001)); *cf. Norma Faye Pyles Lynch Fam. Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 202 (Tenn. 2009) ("Tennessee's courts have, since the earliest days of statehood, recognized and followed self-imposed rules to promote judicial restraint and to provide criteria for determining whether the courts should hear and decide a particular case."). In other words, when the Supreme Court "has promulgated rules that relate to practice and procedure, and a statute provides a contrary practice or procedure, the statute is unconstitutional to the extent of the conflict." *Willeford*, 597 S.W.3d at 466 (quoting *Massey v. David*, 979 So. 2d 931, 937 (Fla. 2008)).

SDC contends that the TPPA conflicts with Rules 8 and 12.02 of the Tennessee Rules of Civil Procedure because the Act (a) "requires plaintiffs to affirmatively prove at the outset of litigation that they can prevail on their claims at trial"; (b) permits defendants "to prove up a 'valid defense' at the outset of a case"; and (c) "abrogates [courts] discretion to grant plaintiffs leave to replead." But we have determined that SDC waived these issues by not making a complete legal argument in its appellate brief.

Rule 27 of the Tennessee Rules of Appellate Procedure requires an appellant's brief to contain an argument section that sets forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record." Tenn. R. App. P. 27(a). In the argument section of its brief, SDC explains the principles and purpose of the separation-of-powers doctrine, with citation to relevant legal authority, but SDC fails to develop an argument to support its contention that the TPPA conflicts with Rules 8 and 12.02. The entirety of SDC's argument on this issue reads:

> The Tennessee Supreme Court implemented its notice-pleading regime "to insure [sic] that cases and controversies be determined upon their merits and not upon legal technicalities or procedural niceties." Without the notice-pleading regime, one can have "no confidence" that a dismissed claim "was frivolous or nonmeritorious." The legislature nevertheless thwarted the Court's rules and policy goals to create and serve its own. Accordingly, the TPPA is unconstitutional.

(Citations omitted).

As our courts have said many times before, "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Pro. Resp. of Supreme Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

For this reason, we affirm the trial court's dismissal of SDC's constitutional challenge based on the separation-of-powers doctrine.

## B. Right to Jury Trial

"The right to a jury trial in Tennessee is expressly guaranteed by Article 1, Section 6, of the Tennessee Constitution, which mandates that 'the right of trial by jury shall remain inviolate.'" *McClay v. Airport Mgmt. Servs., LLC*, 596 S.W.3d 686, 690 (Tenn. 2020). Our courts have interpreted this mandate as giving parties a "right to have a jury determine the underlying facts of the case." *Id.* at 692.

SDC argues that the TPPA violates a respondent's right to have a jury determine the facts of the case because—according to SDC—section 47-18-105(d) lets courts consider countervailing evidence and § 20-17-105(f) allows courts to determine whether a plaintiff has a "likelihood of prevailing":

> The TPPA . . . requires courts to determine before discovery if a plaintiff's claim is supported by evidence and has a threshold level of "merit." Courts can even consider countervailing evidence. In short, courts consider the

- 14 -

factual heft of a complaint, weigh evidence, and conduct a trial-like scrutiny of the merits, to determine whether a plaintiff has a "likelihood of prevailing." That is a "merits-based determination." In fact, the trial court weighed SDC's evidence and determined it could conceivably show actual malice by a preponderance of the evidence but not by clear and convincing evidence.

(Citations omitted).

We disagree with SDC's interpretation of the statute. Subsection 105(d) states, "The court may base its decision on supporting and opposing sworn affidavits stating admissible evidence upon which the liability or defense is based and on other admissible evidence presented by the parties." Tenn. Code Ann. § 20-17-105(d). This language simply defines the scope of evidence that a court may consider when adjudicating a TPPA petition; it does not change the underlying standard of review, which is whether the petitioner or respondent established a "prima facie case."

As the Tennessee Supreme Court explained in *Charles v. McQueen*, 693 S.W.3d 262 (Tenn. 2024), the TPPA's prima facie case requirement is analogous to the evidentiary requirements in Rules 50.01 and 56 of the Tennessee Rules of Civil Procedure because the Act requires the "production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor." *Id.* at 280 (quoting *Prima Facie Case*, Black's Law Dictionary 1441 (11th ed. 2019)). Accordingly, when determining whether a party has satisfied its burden, courts must "view the evidence in the light most favorable to the party seeking to establish the prima facie case and disregard countervailing evidence." *Id.* at 281.

Similarly, we reject SDC's contention that the TPPA violates the right to a jury trial by letting courts determine whether a respondent has a "likelihood of prevailing" on the merits. SDC's argument is based on subsection 105(f), which provides:

(f) If the court determines the responding party established a likelihood of prevailing on a claim:

    (1) The fact that the court made that determination and the substance of the determination may not be admitted into evidence later in the case; and

    (2) The determination does not affect the burden or standard of proof in the proceeding.

Tenn. Code Ann. § 20-17-105(f).

Again, the TPPA requires courts to determine "whether the respondent has made **a prima facie case** for each essential element of his claim." *Charles*, 693 S.W.3d at 267 (quoting Tenn. Code Ann. § 20-17-105(b)) (emphasis added). "If the respondent meets **this**

- 15 -

**burden**, the court **must** deny the petition unless 'the petitioning party establishes a valid defense to the claims in the legal action.'" *Id.* at 267–68 (quoting Tenn. Code Ann. § 20-17-105(b)–(c) (emphasis added)). Subsection 105(f) simply states that *if* the court determines that the responding party showed a likelihood of prevailing, "that determination and the substance of the determination may not be admitted into evidence later in the case" and "**does not affect** the burden or standard of proof in the proceeding." Tenn. Code Ann. § 20-17-105(f).

For these reasons, we affirm the trial court's dismissal of SDC's constitutional challenge based on the right to a jury trial.

## II. PRIMA FACIE CASE: DEFAMATION CLAIMS

To make a prima facie case for each of its defamation claims, SDC had to produce evidence from which a rational jury could conclude that Defendants damaged SDC's reputation by knowingly or recklessly publishing a statement that conveyed a false, defamatory fact about SDC. *See Press, Inc. v. Verran*, 569 S.W.2d 435, 442 (Tenn. 1978).

On appeal, it is uncontested that Defendants published the Reports and that SDC produced prima facie evidence of actual damages. Further, Defendants do not seriously challenge whether the statements at issue could be understood in a defamatory way. Consequently, we will focus our analysis on whether SDC produced evidence from which a rational jury could conclude that the Reports conveyed false facts and, if so, evidence from which a rational jury could clearly and convincingly conclude that Defendants conveyed those facts with knowledge of their falsity or with reckless disregard, i.e., with "actual malice." [3] *See Charles*, 693 S.W.3d 262, at 268.

SDC's defamation claims fall into two categories. First, SDC alleges that the Reports contained false statements of fact. Second, SDC alleges that the Reports contained true statements of fact that nonetheless imply other false facts. SDC refers to the latter as its claims for "defamation by implication." We will discuss each in turn.

### A. Claims Based on Allegedly False Statements of Fact

"Common law has long provided that a person who repeats defamatory statements made by another is also liable for defamation." *Funk v. Scripps Media, Inc.*, 570 S.W.3d 205, 211 (Tenn. 2019); *see also Burke v. Sparta Newspapers, Inc.*, 592 S.W.3d 116, 117, 121–22 (Tenn. 2019) (action for defamation based on republication of statements made by

---

[3] SDC has not appealed the trial court's determination that SDC is subject to the "actual malice" standard.

a third party to a newspaper reporter). SDC asserts claims based on statements made by Ms. Rosemond, Mr. Harwood, and Ms. Nguyen.[4]

### 1. Statements by Ms. Rosemond and Mr. Harwood

SDC contends that it made a prima facie case of defamation based on the statement that Ms. Rosemond's outside orthodontist "diagnosed her with a cross bite possibly caused by the aligners" and the statement that SDC's aligners caused Mr. Harwood's teeth "to detach from the bone." SDC also contends that it established a prima facie case of defamation based on the statement that Ms. Rosemond "tried but couldn't speak to her assigned dentist" and the statement that Mr. Harwood "tried to get in touch with his assigned dentist, but . . . was unable to do so."

But SDC produced no evidence that Ms. Rosemond's dentist did *not* diagnose her with a cross bite, and it produced no evidence that the aligners did *not* "possibly" cause Ms. Rosemond's injuries. That said, SDC *did* produce evidence that its aligners could not have caused Mr. Harwood's injuries. In a declaration, Mr. Harwood's dentist, Dr. Taylor Rice, stated his professional opinion that "the treatment [he] provided to Mr. Harwood via SDC's platform **could not** have caused the problems of which Mr. Harwood complained." (Emphasis added). We agree this is prima facie evidence of falsity regarding the statement about Mr. Harwood's teeth detaching from his jawbone.

To prove falsity regarding the statements about Ms. Rosemond and Mr. Harwood's attempts to contact their SDC-affiliated dentists, SDC produced copies of Ms. Rosemond and Mr. Harwood's account logs and declarations from their respective SDC-affiliated dentists. Ms. Rosemond's dentist, Dr. David Dowling, said that Ms. Rosemond never tried to contact him, and Ms. Rosemond's account log corroborates this. Likewise, Mr. Harwood's dentist, Dr. Rice, said that Mr. Harwood never tried to contact him, and Mr. Harwood's account log corroborates that fact. We conclude this is prima facie evidence of falsity regarding these statements.

Even so, we have also determined that SDC did not produce prima facie evidence of actual malice regarding the statements by and about Ms. Rosemond and Mr. Harwood. Unlike the other elements of a public-figure defamation claim, "actual malice" must be proved by clear and convincing evidence. *See Charles*, 693 S.W.3d at 280. "Evidence is clear and convincing when 'there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* at 281–82 (quoting *Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114, 128 (Tenn. 2013)). Thus, at this stage in the

---

[4] SDC also contends that the Reports contained false statements made by Dr. Kau. However, SDC's brief fails to identify any statement by Dr. Kau that was literally false. *See West v. Media Gen. Convergence, Inc.*, 53 S.W.3d 640, 645 (Tenn. 2001) ("In defamation law, only statements that are false are actionable." (quoting *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 83 (W. Va. 1984)).

proceedings, SDC had to produce evidence from which a rational jury could conclude that SDC established actual malice "by clear and convincing evidence." *See id.* at 281.

To show actual malice, SDC relies only on the declaration of its Vice President of Communications, Kim Atkinson. According to Ms. Atkinson, Defendants did not tell SDC that the Reports would include Ms. Rosemond and Mr. Harwood. SDC asserts this evidence supports "[a] reasonable inference" that Defendants "avoided asking SDC about Ms. Rosemond [and Mr. Harwood]" because Defendants "did not want to learn something that would contradict" their stories. We disagree this inference is reasonable. Regardless, Ms. Atkinson's declaration falls far short of the clear and convincing standard for showing actual malice. *See Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 301 (Tenn. Ct. App. 2007) ("Failing to investigate information provided by others before publishing it, even when a reasonably prudent person would have done so, is not sufficient by itself to establish reckless disregard." (citations omitted)).

For this reason, we conclude that SDC failed to establish a prima facie case of defamation based on the statements about Ms. Rosemond and Mr. Harwood.

### 2. Statements: State Laws

SDC contends it made a prima facie case of defamation based on Ms. Nguyen's statement in the Broadcast that "California just enacted the first law that would require a dentist to look at an x-ray before anyone can start this kind of treatment" and her statement that the California law "bans [SDC]'s confidentiality agreements." The Article similarly stated that "a law went into effect in California requiring all teledentistry patients to get an X-ray before undergoing online aligner treatment" and that "Virginia is considering similar rules."

SDC contends these statements are false because the California law requires treating dentists to review a patient's "most recent diagnostic digital or conventional radiographs or other equivalent bone imaging suitable for orthodontia." Cal. Bus. & Prof. Code § 1680(ah). Likewise, the proposed Virginia legislation would have required dentists to review "bone images or X-rays of the patient" before providing "an appliance for a patient through teledentistry." S.B. 210, 2020 Sess. § 54.1-2708.5(A) (Va. 2020).

In other words, the Reports said that the California and Virginia laws required "x-rays" when the laws also allowed "bone imaging." We find the distinction immaterial because a statement of the truth would not have a different effect on the reader or viewer. *See Stones River Motors, Inc. v. Mid-S. Pub. Co.*, 651 S.W.2d 713, 719–20 (Tenn. Ct. App. 1983) (statement is non-actionable unless "the libel as published would have a different effect on the mind of the reader from that which the pleaded truth would have produced" (quoting *Memphis Pub. Co. v. Nichols*, 569 S.W.2d 412, 420 (Tenn. 1978)). Thus, the Reports' summary of the California and Virginia laws was not materially false.

SDC also failed to produce evidence to show that the California law did not ban SDC's confidentiality agreements. The California law states, "A provider of dental services shall not require a patient to sign an agreement that limits the patient's ability to file a complaint with the board," i.e., the Dental Board of California. Cal. Bus. & Prof. Code § 1680(ah). SDC contends that, contrary to the Broadcast's statement, the California law does not apply to the agreements that SDC used. But SDC did not produce a copy of its confidentiality agreement. Thus, we cannot say whether the agreement limited "the patient's ability to file a complaint with the [Dental Board of California]."

For these reasons, we conclude that SDC did not make a prima facie case of defamation based on the Reports' statements regarding state laws.

### 3. Statements: Hidden-Camera Footage

SDC contends that it made a prima facie case for its defamation claim based on the Article's statement that "employees at SmileDirectClub shops in Ohio, New Jersey, and Alabama advis[ed] potential customers they didn't have to see a dentist before starting treatment."[5]

SDC contends it presented prima facie evidence of falsity by producing transcripts of the unedited hidden-camera footage. First, SDC points to the following passage from the Alabama transcript:

Speaker 1: Do you—do I need to go to a dentist before I do this?

Smile Shop Guide: Yes, I would always recommend. You can do it while you're waiting your three to four weeks or whatnot. But, as long as you have recent radiographs taken within the past two years, I believe is when it's recommended to do that . . . .

Speaker 1: Like an X-ray, a radiograph?

Smile Shop Guide: Yeah, that's an X-ray. Yeah.

Speaker 1: So I should go to a dentist and get an X-ray?

Smile Shop Guide: Yes, right. Yes, absolutely. . . .

.     .     .

---

[5] SDC also quotes the Broadcast. However, SDC's analysis concerns only the statement that "employees at SmileDirectClub shops in Ohio, New Jersey, and Alabama advis[ed] potential customers they didn't have to see a dentist before starting treatment." The Broadcast did not include this statement.

Speaker 1: So you recommend going to the dentist. Is it required?

Smile Shop Guide:   I mean, we do have that in our terms and conditions. So, I mean, I can say it is required . . . .

(Emphasis added). Viewing this evidence in a light most favorable to SDC, we agree that it is prima facie evidence of falsity regarding the statement that an employee in Alabama "advis[ed] potential customers they didn't have to see a dentist before starting treatment."

Second, SDC relies on the following excerpt from the Ohio transcript:

Speaker 1: . . . So do I ever—do I have to see a dentist just before I start or anything like that?

Smile Direct Rep: So that's what our photos and stuff are for. So our doctors are going to make a determination based on like the health of your teeth and photos, make sure that everything looks okay, we don't treat things like like [sic] periodontal disease, like–

Speaker 1: Right.

Smile Direct Rep : –gum recession, any kind of like something we could, you know, damage and if we don't know for sure. They'll ask you to get a clearance from your doctor. So they'll ask you to go through the process of going to your dentist, having your doctor sign off on it and make sure that you're in—you're good.

Speaker 1: So that's if the scan shows I have any sort of issues?

Smile Direct Rep: Scan and photos. So if that is the case, if there is a situation like that, we won't do treatment for you, we won't create a plan, there'll be no charging of anything. We won't do anything until there's like a dental clearance . . . .

(Emphasis added). Viewing this evidence in a light most favorable to SDC, we conclude that it is prima facie evidence of falsity with regard to the statement that an employee in Ohio "advis[ed] potential customers they didn't have to see a dentist before starting treatment."[6]

---

[6] Although the Reports accurately quoted the Ohio employee as saying, "[T]hat's what our photos and stuff are for," the Reports omitted the fact that the employee was discussing dental visits in the context of SDC's onboarding process, i.e., whether seeing a dentist is necessary to get started. This omission is

And third, SDC relies on the following exchange in the New Jersey transcript:

VICKY NGUYEN: . . . And do I need to go see a dentist before I do it?

Speaker 1: We recommend you do but either [sic] **it's not mandatory**. Like if you're updated with your dental cleanings and your fillings you should be fine. . . .

(Emphasis added). This evidence supports rather than rebuts the assertion that SDC's New Jersey employee "advis[ed] potential customers they didn't have to see a dentist before starting treatment."

Although SDC's evidence is capable of proving falsity with regard to the statements attributed to two SDC employees, we conclude this evidence is incapable of proving *material* falsity. The "gist" or "sting" of this part of the Article is that SDC employees were contradicting Ms. Greenspon-Rammelt. A correct statement of the truth would not have changed the message conveyed. *See Stones River Motors, Inc.*, 651 S.W.2d at 719–20. For example, if the Article accurately stated that **one** SDC employee said dentist visits are "not mandatory," the reader would still be left with the impression that Ms. Rammelt-Greenspon was, at the very least, being insincere.

For these reasons, we conclude that SDC did not make a prima facie case of defamation based on the Article's statement that "employees at SmileDirectClub shops in Ohio, New Jersey, and Alabama advis[ed] potential customers they didn't have to see a dentist before starting treatment."

### B. Claims Based on Allegedly Defamatory Implications

Along with the allegedly false statements considered above, SDC contends that the reports used true statements to imply false, defamatory facts.

Under the doctrine of defamation by implication, a true statement of fact may support a defamation claim if the statement reasonably conveys a defamatory meaning. *See Memphis Pub. Co.*, 569 S.W.2d at 420; *see also Loftis v. Rayburn*, No. M2017-01502-COA-R3-CV, 2018 WL 1895842, at *5 (Tenn. Ct. App. Apr. 20, 2018) (discussing law of defamation by implication). In a claim for defamation by implication, "it is the *implication* that must be false, the *implication* that must be defamatory and unprivileged and the *implication* that must be published with the requisite degree of fault." Dobbs et. al, *The Law of Torts* § 566 (2d ed.). The test is whether the statements made are "capable of

---

material because Defendants used the employee's statement in a way that made it appear that the employee was contradicting Ms. Rammelt-Greenspon's assertion that prospective patients are required to have seen a dentist within 6 months before starting treatment.

implicitly bearing a defamatory meaning when read by a reasonable person." *Grant v. Com. Appeal*, No. W2015-00208-COA-R3-CV, 2015 WL 5772524, at *13 (Tenn. Ct. App. Sept. 18, 2015).

SDC contends that various statements in the Reports implied that SDC's dentists are not actually involved during treatment; that treatment through SDC's platform can cause permanent and irreparable harm; that treatment through SDC's platform does not deliver expected results; and that SDC is a "dishonest company."

### 1. Implication: Dentist Involvement

First, SDC contends that statements in the Article[7] implied that SDC's dentists were not actually involved in the supervision of treatment through SDC's platform. In support of this argument, SDC relies on the following passages:

To get started, SmileDirectClub customers either can get a 3D image of their teeth in one of its SmileShops or have an at-home kit sent to them. A few weeks later, [Ms. Rosemond] received dental aligners and followed the instructions to send in photos of her mouth every 90 days. SmileDirectClub told her the treatment would be reviewed remotely by one of its 250 dentists and orthodontists. All of her care was done online, she said.

.      .      .

She'd been assured that she'd be able to get in touch with her assigned dentist, but after multiple attempts, she said she was never connected, nor given contact information. . . .

.      .      .

While SmileDirectClub, the largest at home dental alignment company, and others promise to leave patients smiling, an NBC News investigation into a growing list of complaints found that this new trend in straightening teeth is leading to painful problems for some people.

.      .      .

 . . . [Mr. Harwood] also said that he tried to get in touch with his assigned dentist, but that he was unable to do so.

---

[7] SDC did not cite any portion of the Broadcast in support of this argument.

It's important for teeth straightening patients to see an orthodontist regularly to make sure their bite is correct and their mouth is healthy overall, Kau said.

Regular visits with an orthodontist help ensure everything is on track, Kau said, "Every visit that we spend with a patient, we're constantly making adjustments so we can get the best, optimal care for the patient," he said.

.    .    .

SmileDirectClub reviews all patient scans before sending the first treatment kits, and only sends them to patients that they think are good candidates . . . .

We agree these and other statements in the Article "are capable of implicitly bearing a defamatory meaning when read by a reasonable person." *See Grant*, 2015 WL 5772524, at *13. Specifically, a reasonable person could conclude that SDC—as opposed to its dentists—provided patient care during treatment. However, we have also determined that SDC failed to present prima facie evidence that this implication is false.

To establish falsity, SDC points to a declaration from its Chief Medical Officer, Dr. Jeffrey Sulitzer, and a declaration from an SDC-affiliated dentist, Dr. Gary Moore. Dr. Sulitzer stated that SDC-affiliated dentists "assess, diagnose, and treat patients." And Dr. Moore described the steps he took before, during, and after treatment. Based on this evidence, SDC argues that "patients do not receive aligners until: they provide their *doctors* with medical and dental histories, and detailed images of their teeth and gums; share with the *doctors* a primary objective of treatment; have their *doctors* review and approve a treatment plan; and [have] their *doctors* prescribe aligners."

However, Dr. Sulitzer and Dr. Moore's declarations, as well as other evidence submitted by SDC, show that SDC-affiliated dentists play a minimal albeit important role during treatment. It is undisputed that *SDC* developed the treatment plan; *SDC* assigned the dentist; *SDC* facilitated the prescription and manufacturing process; *SDC* maintained patient records; and *SDC* fielded all patient inquiries. In fact, the record shows that SDC-affiliated dentists had no contact with their patients unless there was a "clinical" question or concern.[8] This limited role was at the heart of SDC's business model: The company

---

[8] SDC has not explained what it considers to be "clinical." The customer service logs for Ms. Rosemond and Mr. Harwood show that each patient contacted SDC on multiple occasions with concerns about pain and improper tooth movement. All those concerns were handled by customer service representatives and Dental Team members, not the assigned dentist.

offered faster, cheaper treatment for mild-to-moderate malocclusion of the teeth by, *inter alia*, reducing the patient's need to make regular visits with their dentist.[9]

Thus, the implication that SDC-affiliated dentists are essentially MIA during treatment is substantially true because a statement of the truth would not "have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Stones River Motors, Inc.*, 651 S.W.2d at 712 (quoting *Memphis Pub. Co.*, 569 S.W.2d at 420).

For these reasons, we conclude that SDC did not make a prima facie case of defamation based on the implication that doctors are "not actually" involved.

### 2. Implication: Permanent Harm

SDC contends that it made a prima facie case of defamation based on the implication that treatment through SDC's platform can cause permanent and irreparable harm.

SDC relies on the following statements from the Article:

> The Better Business Bureau reports more than 1,800 complaints nationwide involving SmileDirectClub. Most of the complaints involve customer service issues-such as broken aligners, delivery issues and payment problems-but dozens describe concerns about treatment results: complaints like broken teeth and nerve damage.

.        .        .

> Dr. Chung Kau, chairman and professor of orthodontics at the University of Alabama in Birmingham, said moving teeth without in-person supervision can lead to permanent harm.

---

[9] In the transcript Defendants' hidden-camera footage in Ohio, an SDC employee explains as follows:

> The dentist that we assign to your case, it's going to be an orthodontist or a general dentist. Each of our states have their own different set, so it has to be a doctor that's licensed in your area, of course. But basically he or she would just stay in their own private office because essentially **they're kind of like contracted through us**. So they get a certain percentage based upon the creation of a treatment plan. And then **our dental team is the one who helps you throughout your treatment** through what we call your patient portal.

And the Alabama SmileShop employee said that customer inquiries were handled by SDC's "team," not "the dentist or orthodontist." She explained, "That's how we keep it less expensive."

Problems with a person's bite aren't just cosmetic. "If you can't get a proper bite, that affects the entire function of your jaw," Kau said. "You could get migraines, jaw joint problems, [and] disintegration of your joints."

"This harm is irreparable. I want to state that," he said. "It's because things like bone loss, disease, loss of a tooth—you can't put it back in the mouth."

That's what happened to Tom Harwood, 40, of Winnemucca, Nevada. Harwood told NBC News that his dentist said the SmileDirectClub aligners moved his teeth so fast that it caused some of them to detach from the bone.

.     .     .

. . . the company's chief legal officer, Susan Greenspon-Rammelt, said the company has helped more than 750,000 people with its network of licensed dental professionals. "They're subject to the same standards of care that a doctor in a traditional setting is," she said.

But NBC News found complaints related to poor patient outcomes, including problems with bite and spacing.

(Emphasis added). And SDC relies on the following statements from the Broadcast:

[NARRATION]: After a year, Anna was in pain and she says she tried but couldn't speak to her assigned dentist. So, she found an orthodontist who diagnosed her with a cross bite possibly caused by the aligners, straining her neck and jaw muscles, sparking migraines.

MS. ROSEMOND: I really noticed that things like didn't feel right with the bite, my head was hurting frequently.

.     .     .

[NARRATION]: Dr. Chung Kau, Chair of Orthodontics at The University of Alabama, says moving teeth without supervision in person, can lead to permanent harm.

DR. KAU: Things like bone loss, disease, loss of a tooth.

We agree that the Reports imply that treatment through SDC's platform can and has caused "[t]hings like bone loss, disease, [and] loss of a tooth." But SDC cites no evidence to show that this message was false, i.e., that treatment through its platform *cannot* and *has not* caused permanent injuries. Instead, SDC argues that it produced prima facie evidence that "treatment using SDC's Platform is as safe or safer than treatment for teeth straightening in a brick-and-mortar office." This, whether true or not, is immaterial to

- 25 -

whether treatment through SDC's platform *can* cause "permanent and irreparable harm" such as "bone loss, disease, [and] loss of a tooth."

For this reason, we conclude that SDC failed to make a prima facie case of defamation based on the implication that treatment through SDC's platform can cause serious complications.

### 3. Implication: Efficacy of Treatment

SDC contends that it established a prima facie case of defamation based on the implication that "treatment using SDC's Platform is not effective." We disagree.

Any implication that treatment through SDC's platform was "not effective" depends on the alleged implication that remote aligner treatment through SDC's platform could cause complications. In other words, the only basis for a rational reader or viewer to conclude that SDC's service and product are ineffective would be based on the implication that treatment is unsafe. The Reports did not question whether SDC's aligners were effective at moving teeth—they questioned whether SDC's business model was causing patient harm.

For this reason, we affirm the trial court's dismissal of SDC's defamation claim based on the alleged implication that treatment through SDC's platform is ineffective.

### 4. Implication: Dishonesty

SDC contends that it established a prima facie case of defamation based on the implication "that SDC is a dishonest company." But whether SDC is a dishonest company is a matter of opinion. Statements of opinion are non-actionable unless they imply "the allegation of undisclosed defamatory facts as the basis for the opinion." *Stones River Motors, Inc.*, 651 S.W.2d at 720 (quoting Restatement (Second) of Torts § 566 (1977)). Here, any implication that SDC is a dishonest company arises from the facts disclosed in the Reports.

For this reason, we affirm the trial court's dismissal of SDC's defamation claim based on the alleged implication that SDC is a "dishonest company."

### III. TENNESSEE CONSUMER PROTECTION ACT CLAIM

SDC contends that it established a prima facie case for its TCPA claim by producing "evidence establishing that the Reports disparaged SDC's Platform and the treatment provided by SDC-affiliated doctors through false and misleading statements." On the other hand, Defendants maintain that the TCPA does not apply because the Act is limited to "transactions between consumers, competitors, and commercial entities that do business with the defendant," which was the basis of the trial court's decision. And even if the TCPA

applies, Defendants argue that First Amendment principles required SDC to prove actual malice, which it did not. We agree with Defendants' second argument.

Resolving these issues requires us to interpret and construe the TCPA. In doing so, we apply the familiar rules of statutory construction:

> A court's primary aim "is to carry out legislative intent without broadening or restricting the statute beyond its intended scope." Courts presume that every word in a statute has meaning and purpose and that these words "should be given full effect if the obvious intention of the General Assembly is not violated by so doing." Words "must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." When the meaning of a statute is clear, "[courts] apply the plain meaning without complicating the task" and enforce the statute as written.

*Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 159 (Tenn. 2021) (quoting *Johnson v. Hopkins*, 432 S.W.3d 840, 848 (Tenn. 2013)).

The TCPA creates a private right of action for "[a]ny person who suffers an ascertainable loss of money or property . . . , or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part." Tenn. Code Ann. § 47-18-109(a)(1). Thus, to establish a prima facie case, SDC had to present prima facie evidence that (1) "another person," i.e., the defendant, engaged in "an unfair or deceptive act or practice described in § 47-18-104(b)" and (2) that the defendant's conduct caused an "ascertainable loss of money or property." *Id.* § 47-18-901(a)(1); *see Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005).

Tennessee Code Annotated 47-18-104(b) describes 67 "unfair or deceptive acts or practices affecting the conduct of any trade or commerce," including "[d]isparaging the goods, services, or business of another by false or misleading representations of fact." *Id.* § 47-18-104(b), (b)(8).

We have already determined that SDC presented prima facie evidence that the Reports contained false representations of fact, and it is uncontested that SDC satisfied its burden of showing an ascertainable loss. Thus, looking only at the Act's plain language, it appears that SDC has satisfied its burden to make a prima facie case under the TCPA.

That being said, we conclude that when a claim of disparagement is made by a public figure based on "false or misleading representations of fact" under § 47-18-104(b)(8), constitutional policy requires that the public figure plaintiff also prove that the defendant made the allegedly disparaging representations with actual malice. Generally, "the defendant's conduct need not be willful or even knowing" to state a claim under the

TCPA. *Tucker*, 180 S.W.3d at 115. But the U.S. Supreme Court has stated that no cause of action "can claim talismanic immunity from constitutional limitations" and actions that repress expression "must be measured by standards that satisfy the First Amendment." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964); *see also Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 56 (1988) (holding that "actual malice" standard applied to claim for intentional infliction of emotional distress based on published statements about public figures and public officials). Accordingly, plaintiffs cannot avoid "the First Amendment limitations on defamation claims by seeking publication damages under non-reputational tort claims, while holding to the normal state law proof standards for these torts." *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999); *see Unelko Corp. v. Rooney*, 912 F.2d 1049, 1057–58 (9th Cir. 1990) (holding claims for product disparagement were "subject to the same first amendment requirements that govern actions for defamation.").[10]

Because we have concluded that SDC failed to present prima facie evidence of actual malice for its defamation claims, we conclude that SDC failed to make a prima facie case of disparagement based on the same statements under Tennessee Code Annotated § 47-18-104(b)(8).[11]

---

[10] Significantly, in *Moore Construction Company, Inc. v. Story Engineering Co., Inc.*, this court noted that "disparagement" is "among the classes of torts recognized in the Restatement (Second) of Torts § 623A (1977)." No. 01A01-9606-CV-00267, 1998 WL 382198, at *4 (Tenn. Ct. App. July 10, 1998). That Restatement section specifies the elements necessary to prove a claim for "Publication of Injurious Falsehood" as follows:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> (a) **he intends** for publication of the statement to result in harm to interests of the other having a pecuniary value, **or either recognizes or should recognize** that it is likely to do so, and
>
> (b) he **knows** that the statement is false or **acts in reckless disregard** of its truth or falsity.

Restatement (Second) of Torts § 623(A) (1977)) (emphasis added); *see also Wagner v. Fleming*, 139 S.W.3d 295, 301–302 (Tenn. Ct. App. 2004) (applying § 623(A)).

[11] The trial court based its decision on the TCPA's preamble in § 47-18-102(4), which states that the Act must "be liberally construed to," *inter alia*, "declare and to provide for civil legal means for maintaining ethical standards of dealing between persons engaged in business and the consuming public to the end that good faith dealings between buyers and sellers at all levels of commerce be had in this state." The court was persuaded by this court's reasoning in *Hall v. Tabb*, No. W2020-00740-COA-R3-CV, 2021 WL 1148539 (Tenn. Ct. App. Mar. 25, 2021) and *White v. Eastland*, No. 01-A-019009-CV-00329, 1991

Accordingly, we affirm the trial court's dismissal of the TCPA claims, albeit on different grounds.[12]

## IV. APPELLATE ATTORNEY FEES

Defendants ask for an award of their appellate attorney fees under Tennessee Code Annotated § 20-17-107, which requires an award of costs and fees "[i]f the court dismisses a legal action pursuant to a petition filed under [the TPPA]." Because we have affirmed the trial court's dismissal, we conclude that Defendants are entitled to an award in an amount to be determined on remand.

## CONCLUSION

Based on the above, we affirm the trial court's dismissal of SDC's defamation claims and its dismissal of SDC's claim under the TCPA and remand the matter for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellant, Cluster Holdco, LLC.

_____

FRANK G. CLEMENT JR., P.J., M.S.

---

WL 149735 (Tenn. Ct. App. Aug. 9, 1991). But those cases dealt with claims by a natural person against another individual related to a sale of real estate. Moreover, § 47-18-102(4) provides only one of five policies that the TCPA promotes; section 47-18-102(2) says that the TCPA must "be liberally construed . . . [t]o protect consumers and **legitimate business enterprises** from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state." Tenn. Code Ann. § 47-18-102(2).

Moreover, "[i]t is well-settled that we may turn to a statute's preamble and policy statements for guidance when seeking to resolve an ambiguity." *Moorcroft v. Stuart*, No. M2013-02295-COA-R3-CV, 2015 WL 413094, at *9 (Tenn. Ct. App. Jan. 30, 2015) (citing *Hyatt v. Taylor*, 788 S.W.2d 554, 556 (Tenn. 1990); *Harrell v. Hamblen Cnty. Q. Ct.*, 526 S.W.2d 505, 508 (Tenn. Ct. App. 1975)). Here, the trial court did not include an analysis of the statutory language in §§ 47-18-104 and -109, which are the controlling statutes in this case. Thus, it made no ruling on whether the language in those sections was ambiguous.

[12] "The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result." *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 60 n.18 (Tenn. Ct. App. 2004) (citations omitted).